No. 19,000.

RICHARD H. CHARTIER AND INDUSTRIAL COMMISSION OF COLORADO *v.* WINSLOW CRANE SERVICE COMPANY.

(350 P. [2d] 1044)

Decided April 4, 1960.   Rehearing denied April 25, 1960.

Mr. KENNETH N. KRIPKE, for plaintiffs in error.

Messrs. DAWSON, NAGEL, SHERMAN & HOWARD, Mr. ARTHUR K. UNDERWOOD, JR., Mr. RAYMOND J. TURNER, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE DOYLE.

THIS is a negligence action instituted by Richard H. Chartier against the Winslow Crane Service Company for personal injuries sustained as the result of the alleged negligence of one of its servants. The Colorado Industrial Commission also appeared as a plaintiff by virtue of its having paid $643.50 in temporary total disability payments on behalf of Chartier's employer, and the parties stipulated that in the event of a judgment in favor of Chartier a judgment would be given in favor of the Commission in the above-mentioned amount plus interest. The jury returned a verdict in favor of Chartier in the amount of $50,531.00; the trial court set this verdict aside and granted defendant's motion for a new trial. Plaintiff elected to stand on the record made at

the trial, and the trial court thereupon dismissed the action. Plaintiff now seeks review of this dismissal by writ of error. The parties will be referred to herein as they appeared in the trial court or by name.

Chartier was employed as an ironworker by the Perlmutter Construction Company in the construction of a five-story building in downtown Denver when the accident that resulted in his injuries occurred. The mode of construction being employed involved the use of vertical columns, cross-beams, and slabs made from prestressed concrete. Chartier was familiar with the construction of these materials, having worked for a number of months in the plant in which his employer manufactured them. The columns were placed in rows and the floors formed by placing the cross-beams on projections from the columns and laying three rectangular slabs within each set of four columns on notches cut four inches into the beams. The space between the floors thus formed and a set of four columns was referred to as a bay. Each slab was 21 feet long, 58 inches wide and 2 inches thick and weighed approximately 2½ tons. Because of the weight and size of these materials, large cranes had to be used to place them in the required position.

At the time of the accident the plaintiff and his foreman, William Gordon, were working on the second floor of the building. The crane of the defendant had a cable attached to a column at the corner of the bay on which plaintiff was working. The beams were already in place and two slabs had been properly placed on the beams. The third slab, however, would not fit between the beams, and it was in the course of efforts undertaken to fit this third slab into the proper position that the accident occurred. The foreman, Gordon, was riding on a beam held by another crane not involved in this action, using it as a stage. The third slab was taken out of the bay in which it was to be placed and set in an already completed bay. A second cable was then attached to the

column mentioned before, the purpose being to draw it back just far enough so that the beam resting on it would also move back to allow the slab to rest properly on the 4 inch notch. Chartier on the bay helped Gordon loop the cable around the column. A bullpin was used that would hold the cable in place on the column when tension was applied to the cable from the crane. Upon attaching the cable, Chartier then walked back into a completed bay, "for safety's sake * * * assuming they were going to pull this column," recognizing the risk of a sudden jerk on the cable. Gordon gave a signal to the crane operator, Lewis, to "tighten up on the load." The signal given could have meant either a slow continuous pull or a direction to take up slack. There is no testimony that a second signal of any kind was given before the accident occurred. This procedure had been used before in the construction of the building and the plaintiff was familiar with it although this type of construction was a new one in general. At this point, Gordon called to Chartier, saying: "Come here, Dick, and help me." Chartier started to walk from the point where he was standing across one of the slabs already in place to the column to which the cables were attached. Just as he did so, the slab fell out from under him and he fell some 15 feet to the ground and was seriously injured by one of the slabs which fell across him, sandwiching him between it and the slab on which he had fallen.

Chartier could not furnish information as to the cause of the slab falling. Lewis, the crane operator, said that Gordon gave him "the slow signal," that he began to take up the line and that then "everything started falling down." He was not able to give any more information about the cause of the accident. Gordon testified that he signalled Lewis to "tighten up on the load * * * take tension on the load," but also could not tell anything that happened thereafter. He said:

"Q. When you gave Mr. Lewis the signal * * * the

slow signal to take up on the tension * * * what happened next? A. Well * * * I can't say * * * I don't know what you are * * * had in mind. How to answer that question * * * I can't answer that. I mean * * * I don't see what * * * I don't understand, maybe * * * perhaps how to state. You want me — Q. I want to know what happened right after the signal was given? A. Well * * * We all know the accident has happened * * * if that's what you want. That's the only answer I know offhand * * * that you asked the question. Q. And that's all you know? A. That's right."

The trial judge rested his grant of defendant's motion for a new trial on five grounds: (1) that the verdict was excessive, (2) that the verdict was not warranted by the evidence, (3) that the verdict was against the substantial weight of the evidence, (4) that the court erred in giving Instruction No. 10 relating to action taken in the face of an emergency, and (5) that the court erred in refusing to give defendant's requested Instruction No. 10 relating to the general elements of a negligence action.

Plaintiff asserts error in the trial court's grant of a new trial in all respects and he contends that the verdict was not excessive, was not against the substantial weight of the evidence and that the instructions given the jury were proper.

The position of the defendant is that the test on review of a grant of a new trial is different from that on the review of a directed verdict and that a grant of a new trial may be disturbed only upon a showing of gross abuse of discretion and that no such showing can be made here. It also contends that the state of the record would have entitled the court to direct a verdict in its favor and asserts that the weight of the evidence overwhelmingly showed contributory negligence and assumption of the risk on the part of the plaintiff. It argues that the trial court was correct in regarding the damages as excessive and in its ruling on instructions.

Defendant, in addition, asserts two further grounds in support of the dismissal:

1. It argues that the crane operator was a "loaned servant" and therefore it is not responsible for his actions.

2. It argues that since plaintiff was injured by one who was in fact a co-worker, his exclusive remedy is under the Workmen's Compensation Act.

Finally, defendant contends that *res ipsa loquitur* has no application to this case.

1. *The question pertaining to review of the order of the district court granting a new trial.*

Generally the courts hold that the order granting a new trial is interlocutory and hence not reviewable. In most jurisdictions the matter cannot be reviewed until a new trial has been had and a judgment has been finally entered. Thus the trial court can weigh the evidence and grant a new trial if it deems the evidence insufficient. In Colorado a different procedure is observed. Here the litigant against whom the new trial has been ordered may elect to stand on this order, obtain a dismissal of the action and thereupon seek a review of the order. The plaintiff in the case at bar has pursued this procedure.

Numerous cases recognize this procedure. The earliest case is that of *Wadsworth v. Union Pacific R.R. Co.*, 18 Colo. 600, 33 Pac. 515. Here the new trial was granted, the matter was reviewed on the question of whether there was sufficient evidence to justify submission of the case to the jury. Other decisions, while recognizing that a review following the grant of motion for a new trial can be obtained, appear to have followed a somewhat different test and to have required a showing that the trial court grossly abused its discretion in granting a new trial on the ground of insufficiency of evidence. *Clifford v. Denver, S.P. & P.R. Co.*, 12 Colo. 125, 20 Pac. 333. See also *Hurt v. Nelson*, 85 Colo. 471, 276 Pac. 982; *Crosby v. Canino*, 89 Colo. 434, 3 P. (2d) 792.

██ The authoritative and clarifying decision is that of *Mooney v. Carter,* 114 Colo. 267, 160 P. (2d) 390. There plaintiff had obtained a jury verdict and the trial court had granted defendant's motion for a new trial on the ground of insufficiency of the evidence. The court reviewed the early authorities and concluded that the order granting a new trial is reviewable and further held that the test on review is whether there is substantial (though conflicting) evidence in the record to support the jury verdict. This evidence, it was held, must be considered in the light most favorable to plaintiff and the presumptions favor the verdict rather than the final judgment of dismissal. The reason for adoption of this test is that the judgment of dismissal is actually a court determination that the evidence was not substantial and that a motion for dismissal or a non-suit should have been granted at the end of the plaintiff's evidence.

Judge Stone, writing for the Court, reasoned that if on review the abuse of discretion test is employed the party seeking the review is deprived of the benefits of the jury trial which he had already had. Stated differently, if an interloctutory review is to be had the verdict should be upheld if there is substantial evidence to support it. Otherwise, the trial court is empowered to circumvent the jury verdict in every case. Judge Stone further pointed out that the trial court under this system is deprived of his control of the course and conduct of the proceeding growing out of the power to grant a new trial based upon his weighing the evidence, but that this factor is outweighed by desirability of affording the litigant all of the benefits of a jury trial. The court found a consistent line of authorities approving the nonsuit or substantial evidence test as a proper approach in connection with the review of an order granting a new trial based upon insufficient evidence. On this point it was said:

"This court long ago, in *Wadsworth v. Union Pacific*

*Ry. Co.,* 18 Colo. 600, 33 Pac. 515, held that in such case as at bar the bringing of the whole record to this court for review, including the bill of exceptions containing all the testimony offered on the trial, clearly indicates that the intention of the parties was to treat the action of the trial court as though the court had dismissed the action or granted a nonsuit on the ground that plaintiff had failed to prove a sufficient case for the jury. Hence the court reviewed the cause according to the intention of the parties. In *Ward v. Teller Rex. & Irr. Co.,* 60 Colo. 47, 153 Pac. 219, we followed the rule announced in the Wadsworth case, and again affirmed it in *Warshauer Co. v. Rio Grande State Bank,* 81 Colo. 463, 256 Pac. 21. In the latter, two actions were brought below, one in conversion and the other in replevin. Verdicts for plaintiff were returned in both actions. Upon motions for new trial, both verdicts were set aside without reasons given. Upon election by plaintiff to stand by the cases as made they were dismissed. On error brought, the two cases were considered together and we found that the evidence was conflicting but that there was ample to support the verdicts returned; therefore, the judgments below were reversed with instructions to overrule the motion for new trial and enter judgment in favor of plaintiff on the verdict in each case. Following, then, this well established rule, if there is substantial, though conflicting, evidence in the case at bar upon which the jury found in favor of plaintiff, this evidence must be considered in the light most favorable to plaintiff and in support of the verdict rather than in support of the final judgment below."

█ In *Kinzbach v. Midwest Plumbing and Heating Company,* 128 Colo. 378, 262 P. (2d) 548, the rule recognizing that an order granting a motion for new trial is subject to review was reiterated. Our most recent decision on the point is *Mobley v. Cartwright,* 141 Colo. 413, 348 P. (2d) 379. In order to obtain a review of the

propriety of the trial court's granting a motion for a new trial, appropriate steps must be taken at the time of the entry of the order — that there can be no review of the granting of a motion for a new trial on the first trial following the second trial.

It may well be that the procedure in such circumstances ought to be changed. It is arguable that the trial judge should have discretion with respect to the granting of a motion for new trial. It would be manifestly unfair, however, to change a rule of settled practice incidental to the decision in this case and hold that although the aggrieved party may seek review of a motion granting new trial, he must demonstrate a gross abuse of discretion in order to obtain a reversal of such an order. If the rule is to be modified, justice and fairness require that a new rule of civil procedure be promulgated effective prospectively only. In the present posture we are constrained to follow the long line of cases which recognize the procedure which has been followed in the case at bar and which authorizes a review of the order based upon the sufficiency of the plaintiff's evidence to establish a prima facie case.

2. *The question whether there was sufficient evidence in the record to warrant submission of the case to the jury.*

Although defendant argues that the test on review should be whether or not the trial judge was guilty of a gross abuse of discretion in granting the new trial, it concedes that the Colorado cases have applied the so-called nonsuit rule. Defendant further contends that the Court was, nevertheless, justified in its ruling because:

"The trial court ruled that the verdict was against the weight of evidence on the question of negligence, although there was minimum evidence present to prevent a directed verdict for defendant. The decision of the trial court as to the weight was unquestionably correct. The defendant feels that not only was the weight of the

evidence against plaintiffs on this point but that there existed *no* competent evidence of negligence."

A review of the evidence convinces us that there was substantial evidence to support the verdict. Lewis, the servant of defendant, was in control of the force which is conceded to have produced the injury. His testimony is that he received a "slow" or "easy pull" signal. This called for taking up the line slack. No further signal was given to him. As to whether Lewis operated the crane so as to produce a quick jerk need not be determined because this is not pivotal. In his testimony plaintiff expressed an opinion to the effect that this logically explained the incident and the injury. Whether this happened was a question for the jury. However, the verdict need not rest on the doubtful opinion of plaintiff. It was within the province of the jury to conclude that a prudent crane operator would not continue to exert pressure upon the supporting pillar here involved to the extent of displacing the slabs so as to produce the collapse and the resultant injuries. The fact that no countersignal was given does not serve to exonerate the crane operator. As a prudent man, Lewis (the crane operator), could have foreseen that the result which occurred would be the product of his failure to cease pulling on the column. Defendant concedes that Gordon, the foreman, was negligent, but this fact does not serve to establish the non-negligence of Lewis. Circumstances may sometimes be such as to render an actor negligent in failing to anticipate the negligence or preoccupation of another. *Eldredge, Culpable Intervention as Superseding Cause,* 86 U. Pa. L. Rev. 121; *Restatement of the Law, Torts,* Sec. 447; *Harper and James, Torts,* Sec. 20.5.

Illustrative of the principle that the foreseeable negligence of a third person does not serve to exonerate the defendant are the following cases: *Simkins v. Dowis,* 100 Colo. 355, 67 P. (2d) 627; *Colorado Mortgage & Investment Co. v. Rees,* 21 Colo. 435, 42 Pac. 42; *Alden v. Wat-*

*son,* 106 Colo. 103, 102 P. (2d) 479. It was said in the *Colorado Mortgage and Investment Co.* case:

" * * * It was the duty of defendant, in operating the elevator in question, to exercise the utmost care and diligence, and to provide and maintain proper and secure fastenings to the doors opening into the elevator way that could not be opened or controlled from the outside. Therefore the court was correct in saying that it was 'wholly immaterial whether such door was opened by some third person or not, provided that such accident could not have happened but for the negligence of the defendant in keeping and maintaining the fastenings to its elevator door;' for, had it performed its duty in the premises, such interference by a third party would have been impossible; hence its negligence necessarily concurred in, and constituted an essential factor in, causing the injury."

In *Simkins v. Dowis,* the rule was applied to a turn table — attractive nuisance fact situation. Here it was said:

" * * * Nor does the fact, as suggested by counsel for the defendant, that the boys who placed the machine in operation were of such an age that they should have anticipated the result of their action and thereby be guilty of negligence themselves, alter the situation. In the case of *Gulf, Colorado & S. F. Ry. Co. v. McWhirter,* 77 Tex. 356, 14 S.W. 26, in which proceeding the plaintiff, a child of five years of age, was injured by a turntable revolved by children over fourteen years of age, the court, at page 360, states: 'Under the evidence and finding of the jury it must be conceded that the negligence of appellant contributed to the injury, and if it be conceded that the person who put the turntable in motion was sui juris this would not relieve the appellant from liability though another party might also be liable.' "

In the *Alden* case, supra, the rule was applied to independent negligent acts.

3. *The question whether the plaintiff was guilty of assumption of risk or contributory negligence as a matter of law.*

■ The basis of defendant's contention that plaintiff is barred from recovery as a matter of law is that the weight of evidence establishes his contributory fault. The defendant does not argue that there is a dearth of evidence in the record to support a finding that the plaintiff was free of contributory negligence. Defendant argues that the trial court was justified in granting the motion for new trial on the basis that the verdict was against the manifest weight of the evidence and that this Court is not in a position to disturb the exercise of discretion by the trial court. As noted above, however, under present conditions, that is, review of the order granting a new trial and dismissing the action, the proper test is whether there was substantial evidence to support the verdict of the jury. We are convinced that judged by this standard the evidence does not show contributory negligence to a degree which justifies the granting of a new trial.

Defendant's argument proceeds from that fact that plaintiff selected a foreseeably dangerous route when he could have followed a safe course. Defendant asserts that from his place of safety plaintiff could have reached his objective without walking on the slabs which were being fitted in place and which were loose, and that had he done so he would have escaped serious injury. Sketches which illustrate this thesis are included in defendant's brief, and are shown at right:

In evaluating this contention, it must be pointed out that plaintiff was ordered by his foreman to proceed from the place of safety to the place of danger and thus this movement was not one of free choice. The other aspect that one route was safe and one route was hazardous is easy to say in retrospect. To be sure, plaintiff would have been safe while he was walking on the so-called completed bay. There is less reason to suppose,

## FIGURE 1. Vertical View

## FIGURE 2. Oblique View

A — Chartier standing here when Gordon called for assistance.

B — Place where Chartier was going.

X — Chartier had stepped on slab when it fell.

however, that he would have continued in safety as he walked along the connecting beam to the place where Gordon was seeking to secure the crane cable. There was small choice as between the loose slabs and the cross-beam to which the slabs were attached. Both appeared dangerous and consequently the fact that one route is now shown to have been safe fails to establish that plaintiff voluntarily assumed the risk. The cases relied on by defendant, namely, *Denver & Rio Grande Railroad Co. v. Komfala,* 69 Colo. 318, 194 Pac. 615; *Midland Terminal Railway Co. v. Patton,* 74 Colo. 132, 219 Pac. 781; *McKean v. Colo. Fuel and Iron Co.,* 18 Colo. App. 285, 71 Pac. 425; *City and County of Denver v. Farmer,* 125 Colo. 462, 244 P. (2d) 1086, do not govern the present circumstances.

▆ Particular facts no doubt justify conclusions that the defendant assumed the risk. It is sufficient in the present case to note that neither of the possible routes could be regarded as safe. There is also here present the aspect of speedy action. The circumstances show that the problem to which the plaintiff was addressing himself was one which demanded quick action. In view of these circumstances, it cannot be said that the question lacked substance sufficient to require its submission to the jury. Cf. *National Fuel Co. v. Green,* 50 Colo. 307, 115 Pac. 709.

▆ It is axiomatic that the question of contributory negligence is one for the jury where the facts are disputed and where reasonable minds could reach different conclusions. *Rudolph v. Elder,* 105 Colo. 105, 95 P. (2d) 827; *Gordon v. Clotsworthy,* 127 Colo. 377, 257 P. (2d) 410; *Parker v. City and County of Denver,* 128 Colo. 355, 262 P. (2d) 553; *Yockey Trucking Co., Inc., v. Handy,* 128 Colo. 404, 262 P. (2d) 930; *Stephens v. Lung,* 133 Colo. 560, 298 P. (2d) 960.

4. *The question whether Lewis was a loaned servant under the control of the general contractor so that defendant was not vicariously responsible.*

The operator of the crane was in the employ of the defendant. The equipment, complete with operator and with maintenance furnished, was shown to have been leased to the Weicker Storage and Moving Co. which in turn had a contract with the Perlmutter Construction Company whereby the crane was made available to Perlmutter, together with other services furnished by Weicker. It is further shown that Lewis was in this case and customarily directed to a particular job by defendant's dispatcher; that he was paid, and his Workmen's Compensation was carried, by defendant. Moreover, the manner of the operation of the machine was the responsibility of the defendant. On the job to which the equipment was assigned, the crane operater was directed to the place where the work was to be performed and was instructed by the contractor regarding his particular mission. Hand signals were given in the course of the work by the foreman for the contractor. It is contended by the defendant that the undisputed facts give rise to the legal conclusion that the contractor, Perlmutter, and not the defendant was charged with vicarious responsibility for negligent acts, if any, of Lewis, and the question which we are called upon to determine is whether the circumstances here shown to exist have the legal consequence which the defendant contends that they have.

The Colorado cases which bear on the question are the following: *Frerker v. Nicholson,* 41 Colo. 12, 92 Pac. 224, which held that the driver of a carriage which was leased to a funeral parlor continued to be the servant of the lessor even while performing services for the funeral parlor; *Thayer v. Kirchhof,* 83 Colo. 480, 266 Pac. 225, holding that a general contractor was not liable for the negligent acts of a driver where a sub-contractor had leased the wagon and driver from a third person; *Gallagher Transfer & Storage Co. v. Public Service Co. of Colorado,* 111 Colo. 162, 138 P. (2d) 926, holding that the owner of a power shovel, together with an operator

leased to the Public Service Company for the purpose of digging a ditch, was not liable because the Public Service Company had complete control of the project; *Landis v. McGowan,* 114 Colo. 355, 165 P. (2d) 180, holding that an owner of a sightseeing limousine was responsible for the negligence of the driver, his employee, notwithstanding that the vehicle and the driver were engaged in performing services for another company.

The *Landis* opinion is a fully reasoned one which holds that momentary control of the employee is not the determining factor; whether the owner of the vehicle is vicariously liable depends upon all of the facts. The Court pointed out (114 Colo. 371) that even though the lessee may direct the driver as to where to go and what to do in connection with a trip that the driver is nevertheless the employee of the owner of the vehicle where it is shown that the owner contracted with a third person for the performance of this service, including compensation. The owner had the responsibility of the maintenance of the vehicle, was shown to have assumed responsibility for an injury resulting from the driver's negligence (by taking the injured person to the hospital). The Court concluded that these circumstances established a master-servant relationship as a matter of law. The *Gallagher Transfer & Storage* case was clarified and distinguished and it was said that the statements contained in the *Gallagher* case were dicta. The Court concluded that there is not a specific determinative control test; that general principles govern the decision.

The *Restatement of the Law of Torts,* Sec. 227, recognizes that:

"A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others."

The inference continues, however, that the employee remains in his general employment. The comment to this section brings out this point and calls attention to

the factors to be considered when faced with such a problem. It was there said:

"b. *Inference that original service continues.* In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.

"c. *Factors to be considered.* Many of the factors stated in Section 220 which determine that a person is a servant are also useful in determining whether the lent servant has become the servant of the borrowing employer. Thus a continuation of the general employment is indicated by the fact that the general employer can properly substitute another servant at any time, that the time of the new employment is short, and that the lent servant has the skill of a specialist.

"A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality, and these may be opposed to the interest of the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise, permits his servant and instrumentality to assist another, is more apt to intend to surrender control."

An extensive annotation in 17 A.L.R. (2d) 1388 com-

ments at length and reports the numerous cases on the subject. Perhaps the leading case from the standpoint of most frequent citation is that of the Supreme Court of the United States in *Standard Oil Co. v. Anderson* (1909), 212 U.S. 215, 53 L. Ed. 480, 29 S. Ct. 252. This matter is close to the case at bar on its facts. There the plaintiff was a longshoreman who was injured while working in the hold of a ship. A load of cases was lowered by a winchman in the general employ of the Standard Oil Co. and struck and injured the plaintiff. The winchman was hired and paid by the defendant which alone had the right to discharge him. As in the case at bar, the plaintiff's employer paid a certain rate for the hoisting and exercised a limited control over the winchman in that they directed him to hoist at particular times and directed the lowering of the cargo and did so by use of signals as in the present case. The Supreme Court held that the winchman remained in the service of the defendant, his general employer, and said:

"  *  *  * The winchman was, undoubtedly, in the general employ of the defendant, who selected him, paid his wages, and had the right to discharge him for incompetency, misconduct or any other reason. In order to relieve the defendant from the results of the legal relation of master and servant it must appear that that relation, for the time, had been suspended and a new like relation between the winchman and the [plaintiff's employer] had been created. The evidence in this case does not warrant the conclusion that this changed relation had come into existence. For reasons satisfactory to it the defendant preferred to do the work of hoisting itself, and received an agreed compensation for it. The power, the winch, the drum and the winchman were its own. It did not furnish them but furnished the work they did to [plaintiff's employer]. That work was done by the defendant, for a price, as its own work, by and through its own instrumentalities and servant, under its own control. Much stress is laid upon the fact that

the winchman obeyed the signals of the gangmen, who represented [plaintiff's employer], in timing the raising and lowering of [the cargo]. But when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be cooperation and coordination, or there will be chaos. The giving of the signals under the circumstances of this case was not the giving of orders, but of information, and the obedience to those signals showed cooperation rather than subordination, and is not enough to show that there has been a change of masters."

■ Another frequently cited case which was relied on in *Landis v. McGowan*, supra, is that of the New York Court of Appeals in *Charles v. Barrett*, 233 N.Y. 127, 135 N.E. 199. On the facts there presented it was held by the Court of Appeals in an opinion by the late Mr. Justice Cardozo that the driver of the truck which had there been leased remained the servant of the owner of the truck. Though its facts are somewhat different in that the "momentary" control here present did not exist in the Barrett case, its language is nevertheless helpful in that it shows the operation of the presumption of continued employment and the importance of the factor that the employee was carrying on and furthering the business of his employer. It was there said:

"Where to go and when might be determined for the driver by the commands of the defendant. The duty of going carefully, for the safety of the van as well as for that of wayfarers, remained a duty to the master at whose hands he had received possession. Neither the contract nor its performance shows a change of control so radical as to disturb that duty or its incidence . . . The rule now is that, as long as the employee is furthering the business of his general employer by the service rendered to another, there will be no inference of a new relation unless command has been surrendered, and no inference of its surrender from the mere fact of its division."

Cases holding that there is in fact a shift in relationship, the legal consequence of which is exoneration of the general employer, are to be found. See 17 A.L.R. (2d) 1388, etc. We do not, however, believe that these should govern the case at bar. The present case impresses us as one in which the defendant's responsibility continued. The evidence shows the crane in question to be very valuable ($50,000.00). It is shown that the operator is a highly trained specialist. The defendant has full responsibility for maintenance. The defendant is generally engaged in leasing this type of equipment complete with an operator and with fuel and maintenance furnished. The operator is directed to do particular work, but from the standpoint of the general contractor, it is the result that is important. In other words, he does not direct the operator with respect to the manner of operation. The operator knows full well the amount of force asserted by the instrumentality and in turn the general employer should be held responsible under the law for negligent movements of the machine which result in injuries to others. Consistent with our holding that the operator, Lewis, owed a duty to exercise a high degree of alertness so as to prevent a catastrophe such as that which occurred here, we hold that even though there was some division of control that this did not operate to shift responsibility of the defendant for the actions of the operator of the crane. It follows, therefore, that the trial court's dismissal on the basis of insufficiency of evidence and other alleged errors cannot on this review be justified on the ground that defendant was not in law responsible for the acts of his servant, Lewis.

5. *The question whether the damages were excessive.*

Plaintiff's injuries were severe. He fell 15 feet and landed on top of a concrete slab and was then struck by a 2½ ton concrete slab which also fell a distance of 15 feet. The plaintiff and two orthopedic surgeons testified to the severity of the injuries. The plaintiff suffered

a multiple compound fracture of the left elbow requiring an open reduction and a severe fracture of the pelvis. He was hospitalized from March 10, 1956 to April 4, 1956 and remained on crutches for two months following his discharge from the hospital. The ulnar nerve in the injured elbow did not heal properly and an operation was required in July of 1956 to remove a tumor on the nerve. Since the operation shortened the nerve an inch and a quarter, the nerve had to be transferred from the back of the elbow to the front of the elbow. A second operation was required some time later to correct the first which had not been entirely successful. Both doctors predicted that traumatic arthritis would develop in the elbow as a result of the injury and would grow worse, one of them stating that the beginnings of this condition could already be noticed on X-rays. The left arm is permanently injured, the nerve damage resulting in the atrophying of certain muscles of the hand, loss of control of certain areas. The fractured pelvis has healed but with a "still very marked distortion." The plaintiff has had continued pain in the back and legs, and his back injury will probably interfere somewhat with future heavy work.

Plaintiff was 37 years old and had a life expectancy of 31.76 years. His income during the three years preceding the injury averaged $8,200. During these years he averaged $6,900 for work in Greenland. Because of his injury he was unable to report for work in Greenland when called and he was not called in 1957, selection being made first from employees of the prior years. His income in 1956 was $5,300 and in 1957, $6,300. One of the doctors rated plaintiff's disability as a working unit at 5 per cent, the other rated it at 15 per cent.

In view of the foregoing outline of the evidence presented on the issue of damages, the nature of the plaintiff's occupation, the likelihood of increasing disability, the pain and suffering necessarily connected with the injuries and treatment he received, it is our

conclusion that the trial court erred in setting aside the verdict on the ground that the damages were excessive. The test for determining whether an award of damages lies within valid limits has been set forth by this Court previously in *Lehrer v. Lorenzen,* 124 Colo. 17, 233 P. (2d) 382, where the question of inadequacy of a verdict was involved. It was there said that a verdict will not be set aside unless it is grossly and manifestly inadequate. It was further stated in that opinion:

" * * * The amount of such loss was a question of fact peculiarly within the province of the jury, and if the trial judge was permitted to set aside the verdict simply because he would have fixed a different amount, then in cases of this nature, juries would be entirely unnecessary."

Judging the evidence in this case in the light of the standard of the *Lehrer* case, we are constrained to hold that the trial court's action in holding the verdict was excessive was improper.

6. *The question whether plaintiff was barred from a recovery on the theory that he was injured by a co-worker engaged in common employment and is therefore restricted to a remedy under the Workmen's Compensation Act.*

■ Defendant contends that plaintiff has no action against it because of having a remedy against his employer under the Workmen's Compensation Act. It says that having received benefits under that Act plaintiff has surrendered all common law remedies. C.R.S. '53, 81-4-4. We read this section as applying only to remedies against the immediate employer. It does not operate to relieve a third person such as the defendant in this case. Section 81-13-8 expresses a legislative intent contrary to the argument of defendant. Under this section, the injured person may elect to proceed against a third person and the only limitation is that the third person shall not be "in the same employ."

In harmony with our conclusion that defendant was

a contractor, we hold that Lewis was not in the "same employ" within this statute. The case of *Hartford Accident and Indemnity Co. v. Clifton,* 117 Colo. 547, 190 P. (2d) 909, which held that the employee of a sub-contractor, was precluded from suing a general contractor, was based upon Section 81-9-1 and is not authority for the present proposition.

*Larson on Workmen's Compensation,* Vol. 2, Sec. 70.32 discusses this specific problem and points out that the great majority of courts hold that a subcontractor is subject to a suit. The Massachusetts cases cited and relied on by defendant represent a minority viewpoint. Florida also adheres to this rule.

The purpose of the Workmen's Compensation Act is to provide a remedy in areas where remedies do not exist at common law. Where the provisions of the act do not expressly limit the employee with respect to other remedies we are not disposed to read or interpret such limitations into the Workmen's Compensation statutes. The possibility proposed by the defendant that the plaintiff here can get a double recovery is not a real threat. The Industrial Commission would be subrogated to the plaintiff against the defendant with respect to any sums which he recovers here which are in the nature of compensation. Cf. *Jacobson v. Doan,* 136 Colo. 496, 319 P. (2d) 975.

The judgment is reversed and the cause is remanded with directions to reinstate the verdict and to enter judgment thereon.

MR. JUSTICE MOORE and MR. JUSTICE KNAUSS concur.