No. 20,614.

J & K CONSTRUCTION COMPANY *v.* OSCAR MOLTON.
(390 P. [2d] 68)

Decided February 24, 1964.    Rehearing denied March 23, 1964.

Messrs. TILLY and SKELTON, for plaintiff in error.

Mr. ELIAS J. CANDELL, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE PRINGLE.

WE will refer to the parties as they appeared in the trial court where plaintiff in error was defendant and defendant in error was plaintiff.

This writ of error is brought to review a judgment entered for the plaintiff Molton for personal injuries sustained by him while assisting in the erection and placing of long-span joists or trusses between the tops of the sidewalls of a building being constructed by the defendant J & K Construction Company for an automobile dealer. The cause was tried to a jury of six which returned a verdict in the amount of $41,925.32, upon which judgment was accordingly entered.

The defendant contends for reversal that:

I. There was insufficient evidence presented by the plaintiff of negligence on the part of the defendant to permit the case to go to the jury and the question of "general" negligence was not presented by the plaintiff's amended complaint.

II. Plaintiff was, as a matter of law, the employee of the defendant and, therefore, was estopped from asserting his common law remedy against it by reason of the provisions of the Workmen's Compensation Act or was, as a matter of law, limited to recovery of $10,000 by reason of being an employee "loaned" to the defendant.

III. The trial court erred in failing to admonish the jury with respect to implications it might draw from an alleged "improper contact" between a proposed witness and the jurors.

We find no merit in the defendant's contentions for reasons which hereafter appear.

I.

*Was there sufficient evidence presented by the plaintiff of the defendant's negligence to carry the case to the jury and was the allegation of "general" negligence pre-*

*sented by the plaintiff's amended complaint?* The answers are in the affirmative.

Considering the latter point first, it is the defendant's contention that the amended complaint asserts only two grounds for relief: (1) negligence *per se* based upon a purported violation of C.R.S. '53, 80-16-1, which provides in substance that one who employs or directs another to perform labor in the erection or construction of a building shall not furnish or erect for the performance of work any unsafe scaffolding, hoists, stays, ladders or other mechanical contrivances and shall not construct nor operate the same so as to give improper protection to the employee, and (2) *res ipsa loquitur.* Defendant contends that "general" negligence is not alleged in the amended complaint. At the conclusion of the plaintiff's case, the trial court, in considering the defendant's motion for a directed verdict, determined that negligence *per se,* based upon a purported violation of the above statute, would not lie and the plaintiff relinquished any contentions he might have had based upon the doctrine of *res ipsa loquitur.*

The pertinent paragraphs of the amended complaint are as follows:

"4. At said time and place defendant was negligent toward plaintiff by directing him to perform certain labor in the erection of said building without furnishing or erecting for the performance of such labor, scaffolding, hoists, stays, ladders, or any other mechanical contrivances constructed, placed and operated so as to give proper protection to the life and limb of the plaintiff so engaged.

"5. At said time and place defendant was negligent toward plaintiff by directing him to perform certain labor in the erection of said building, which labor required plaintiff to stand upon a steel joist about 20 feet above the ground, which joist had been fabricated by the defendant and was under its exclusive control in the

inspection, fabrication, erection, and all other phases of the use thereof.

"6. While plaintiff was standing upon the said steel joist to perform the labor as directed, the joist fell from its support, throwing the plaintiff to the ground and landing on top of him.

"7. The above accident happened through no fault of the plaintiff and never would have happened but for the negligence of the defendant."

In our view, the amended complaint was sufficient to put the defendant on notice that "general" negligence was being asserted. The test to be applied is whether the complaint gives *fair notice* to the adverse party to enable him to answer and prepare for trial and one does not stand or fall on a "theory" or "cause of action" as obtained under the practice prior to adoption of the Rules of Civil Procedure, under which the substance and not the form of the claim is of controlling significance. *Hutchinson v. Hutchinson,* 149 Colo. 38, 367 P. (2d) 594; *Smith v. Mills,* 123 Colo. 11, 225 P. (2d) 483; *Bridges v. Ingram,* 122 Colo. 501, 223 P. (2d) 1051; 2 *Moore's Federal Practice,* 2d Ed., Sec. 8.13, pp. 1692, 1695 and Sec. 8.14, p. 1713. *Spomer v. City of Grand Junction,* 144 Colo. 207, 355 P. (2d) 960, contains the following highly pertinent comment:

"Rulings of this court under former practice and procedure that pleadings are construed most strongly against the pleader are not in harmony with present day procedure in civil actions. The rule now is that pleadings are to be construed in favor of the pleader. * * * "

The record shows that throughout the entire proceedings counsel for the defendant was clearly aware of the conduct which the plaintiff contended constituted negligence on the part of defendant and that the defense was grounded on the contention that none of these acts amounted to negligence. Under such circumstances, we cannot say that the defendant was prejudiced in any

way by the particular manner in which "general" negligence was alleged in the complaint.

We now proceed to a consideration of the evidence which was presented to prove negligence. The accident in question occurred while the plaintiff was engaged in connecting "X-bracing" in the middle of a truss. "X-bracing" consists of metal rods or pipes which are fastened near the top chord of each truss and connect to a point near the bottom chord of each adjacent truss, providing perpendicular stability from truss to truss and tending to make one complete unit of all the trusses installed for roof support. While the plaintiff was connecting this "X-bracing," the truss on which he was working rolled and the plaintiff fell to the ground some fifteen or twenty feet below. The two-ton truss followed him down and struck him upon the leg, inflicting very serious injuries.

Each truss had an overall length of some eighty feet, made up of two forty-foot sections bolted together, and measuring approximately ten inches across the top chord. There was an open "web" leading to the lower chord, which was another reinforced flat steel plate somewhat shorter in overall length. The assembled truss, when placed in position on the walls, rested upon steel plates in the walls supporting either end of the longer or upper chord, and the lower chord hung directly below into the building area. The lower part of the upper chord, bearing on the metal plates in the walls, was to be welded to those metal plates after "X-bracing" had been attached. The trusses were designed to span the building between its sidewalls and to support the roof.

As indicated above, the trusses were composed of two forty-foot sections. These sections were bolted together at the job site by defendant's employees under the direct supervision of defendant's foreman. A crane was employed for the purpose of lifting and placing the trusses between the walls. The crane operator, acting upon signals from men on top of the walls and with the

assistance of other men on the ground, would attach cables to two points on each truss, lift the truss into the air and swing it into its proper position resting upon the metal plates on the walls. On each wall a man was stationed to supervise the landing of the truss and after it was placed in position these men would walk out on the truss to the point where the cables were attached and release them.

Shortly before noon on the day of the accident in question, the truss from which the plaintiff fell was placed in its position between the walls. The cable supports of the crane were released and the workmen went to lunch. After lunch, the plaintiff walked out along the top of the truss to connect the "X-bracing" in the middle and while he was so occupied the truss rolled resulting in the events described above.

Since the jury brought in a verdict for the plaintiff, we must examine the evidence in the light most favorable to the plaintiff's case and every inference fairly deducible from the evidence must be drawn in favor of the judgment. *Maloney v. Jussel,* 125 Colo. 125, 241 P. (2d) 862; *McCarthy v. Eddings,* 109 Colo. 526, 127 P. (2d) 883; *Venetucci v. City of Colorado Springs,* 99 Colo. 389, 63 P. (2d) 462. Viewed in this light, the evidence in support of the verdict establishes that the truss in question had afforded some difficulty to the defendant's crew when assembling the two forty-foot sections in that the holes of the plates by which the sections were assembled were not properly aligned and were at an angle. The bolts were then forced into the assembly slaunchways by the use of an air hammer and socket. A journeyman ironworker with twenty-two years of experience in the field testified that the proper procedure in such a situation was to use a cutting torch to make the holes match. The same witness testified that when the bolt was forced into the assembly the plate curled. The defendant's foreman testified that while all of the trusses were somewhat bowed, this particular

truss was bowed more than the others; that a bowed truss has a tendency to roll; and that the plaintiff's weight on this particular truss "gave it that much more leverage to roll over."

The defendant was a general contractor and the plaintiff, as will be hereinafter developed, was the employee of a sub-contractor, the AAA Welding and Crane Service. A general contractor owes a duty of ordinary care to provide the employees of a sub-contractor a reasonably safe place in which to work. *Butler v. King,* 99 N.H. 150, 106 A. (2d) 385; *Meny v. Carlson,* 6 N.J. 82, 77 A. (2d) 245; *Smith v. Henger,* 148 Tex. 456, 226 S.W. (2d) 425, 20 A.L.R. (2d) 853; *Johnson v. Nicholson,* 159 Cal. App. (2d) 395, 324 P. (2d) 307. A rather entensive annotation on the subject appears at 20 A.L.R. (2d) 868.

In *Lisle v. Anderson,* 61 Okla. 68, 159 Pac. 278, the defendants as general contractors installed joists in the attic of a building, one of which was defective. The joists were to be used to support a tank as part of a heating and ventilating system to be installed by the plaintiff's employer. While the plaintiff was engaged in placing the tank upon the joists, one of them broke and the plaintiff fell some twelve or fifteen feet. In sustaining a verdict for the plaintiff the court held that if the defendants knew, or by the exercise of ordinary care could have known, that the plaintiff might be reasonably expected to go upon the joists to install the tank, they owed the plaintiff the duty to exercise ordinary care in the selection of the joists.

In the case at bar there is no question but that the plaintiff was expected to walk upon the trusses for the purpose of connecting the "X-bracing." There was evidence from which the jury could infer that the truss from which plaintiff fell was bowed more than the other trusses by reason of improper assembly with the consequence that it had a greater tendency to roll than the others, and that the defendant, through its foreman, did not exercise ordinary care and caution in permitting such

a truss to be erected upon which plaintiff would be expected to work in the carrying out of his duties. The questions of the defendant's negligence and plaintiff's contributory negligence or assumption of risk were peculiarly well-suited for submission to the jury under the circumstances of this case and we cannot say as a matter of law that the evidence was insufficient to support the jury's finding. We conclude that the trial court committed no error in refusing to grant the defendant's motion for a directed verdict and in refusing to grant a new trial on the ground that the evidence was insufficient to sustain the jury's verdict.

II.

*Is the plaintiff either barred from or limited in the amount of recovery by virtue of an employment relationship with the defendant?* The answer is in the negative.

The plaintiff was employed by the AAA Welding and Crane Service as a welder and ironworker. On September 7, 1960, the J & K Construction Company ordered a crane and a welding machine and operators for the same from AAA Welding and Crane Service for the purpose of erecting the trusses. Some delay was occasioned and the men and equipment were not needed until the morning of Friday, September 23, 1960. On that date, the plaintiff was directed by his employer to take his welding equipment to the construction site to weld or otherwise assist as might be directed. Since the trusses had arrived in forty-foot sections, the sections were bolted together on Friday so as to make trusses of sufficient length to span the walls. The plaintiff on that date worked at assembling the crane and marking the spots for the placement of the trusses upon the walls. On the following Monday, the date of the accident, he was engaged in connecting the "X-bracing" as previously indicated.

The defendant's foreman testified that since he was short of the number of men needed for the erection of

trusses, he "hired" the plaintiff to work on his iron-worker crew after receiving permission from the union to do so and that he turned in the plaintiff's "time slips" to the defendant's superintendent. Contrary to this, the plaintiff testified that, in addition to the actual welding to be done on the trusses, he was expected by his employer, as part of the job for which he had been sent, to assist in making the trusses ready for welding if they were not ready at the time of his arrival and that he was not working for J & K Construction Company at any time. The testimony is undisputed that AAA Welding and Crane Service at all times paid the plaintiff's wages and withheld his income tax and social security tax and that it could have replaced him at any time with another man without the consent or agreement of the defendant.

The defendant contended in the trial court that it became the *actual* employer of the plaintiff *as a matter of law* by a "contract of hire, express or implied," as provided by C.R.S. '53, 81-2-6, and that plaintiff was therefore barred from pursuing a common law remedy against it, or, in the alternative, that the plaintiff was a "loaned" employee *as a matter of law* and therefore the plaintiff's recovery was limited to $10,000 under C.R.S. '53, 80-6-4. The trial court rejected these contentions and submitted the issue of the plaintiff's employment status to the jury under proper instructions and the defendant contends that the trial court erred in so submitting that issue to the jury.

The philosophy expressed in *Great Western Sugar Co. v. Erbes,* 148 Colo. 566, 367 P. (2d) 329, and in *Chartier v. Winslow Crane Service Co.,* 142 Colo. 294, 350 P. (2d) 1044, that where the Workmen's Compensation Act does not expressly limit an employee with respect to his common law remedies we are not disposed to read such limitations into the Act is helpful in defining the fundamental approach to the problem before us in the instant case. See also *Thomas v. Farnsworth Chambers Co.,* 10 Cir., 286 F. (2d) 270.

The defendant's first proposition, that it became the *actual* employer of the plaintiff as a matter of law under a "contract of hire, express or implied," obviously requires a *finding* that a contract was, in fact, made. There was conflicting evidence upon this issue and the trial court properly submitted it to the jury. Appropriate instructions on this issue were given and the jury, by its verdict, found that no such contract had been entered into. We are bound by this finding.

The second proposition, while more complex, was similarly properly submitted to the jury. As indicated above, this contention is premised on the theory that the plaintiff was a "loaned" servant of the defendant as a matter of law. The defendant relies heavily on the case of *Jacobson v. Doan,* 136 Colo. 496, 319 P. (2d) 975, in support of its position, but we find no statement in that case which might even remotely suggest that this question cannot, when the evidence is conflicting, be resolved by a jury when submitted with appropriate instructions. On the contrary, the record in *Jacobson,* supra, discloses that the issue was not submitted to the jury and that the case was not in fact tried on the theory that the plaintiff was a loaned employee of the defendant at the time of his injuries. Moreover, the opinion in *Jacobson,* supra, contains the following highly pertinent comment:

" * * * The *undisputed evidence* firmly establishes the fact that at the time Doan was injured he and the four other loaned employees of the May Company and the three employees of defendant were all employees or servants of the defendant. * * * " (Emphasis supplied.)

*Chartier v. Winslow Crane Service,* supra, contains an extensive review of the authorities and delineates the approach to be followed in determining under what circumstances a servant becomes a "loaned" employee. No good purpose would be served by restating all the principles enunciated in that case or all the authorities therein cited, but attention should be particularly

directed to *Restatement (Second) Agency,* § 227, where
it is said:

"b. *Inference that original service continues.* In the
absence of evidence to the contrary, there is an inference
that the actor remains in his general employment so
long as, by the service rendered another, he is perform-
ing the business entrusted to him by the general em-
ployer. There is no inference that because the general
employer has permitted a division of control, he has
surrendered it."

The case most nearly dealing with the question here
is *Great Western Sugar Co. v. Erbes,* supra, where it was
held in similar circumstances that the issue as to whether
the servant remained the employee of his general em-
ployer or became a "loaned" employee was a mixed
question of law and fact and was properly a question
to be answered by the jury under appropriate instruc-
tions. We see no reason for departing from the rule there
articulated. No objection was made in the court below to
the form of the instruction given on this issue.

█ Since the jury by its verdict determined, upon
disputed evidence, that the plaintiff was neither a hired
employee nor a "loaned" employee of the defendant, we
are not disposed to interfere.

### III.

*Did the trial court err in failing to admonish the jury
with respect to implications it might draw from an
alleged "improper contact" between a proposed witness
and the jurors?* The answer is in the negative.

During the course of the trial, the defendant's counsel
advised the trial court as follows:

"*Mr. Tilly:* A matter has come to my attention which
I feel should be called to the attention of the Court for
such action or inaction as the Court deems necessary;
and I do not frankly know what the portent of it is.

"The plaintiff's attorney served me with a succession
of notices of witnesses and exhibits which he might call
or present. Among those listed was a purported twin

brother of the plaintiff whose presence was to be utilized, according to this notice, to demonstrate the fact that the plaintiff and his twin were of identical appearance before the accident and that the plaintiff had aged considerably since. There is a party here in the court room, and he has been here throughout the trial, who appears to be one of the parties in one of the pictures plaintiff's counsel furnished me. I do not know whether this is the twin brother or not. He has not been called.

"But on at least two occasions during the course of the trial we have observed him conversing with the Jury.

"*Mr. Crandell:* This is all news to me.

"*Mr. Tilly:* I understand that and I'm not charging you with any complicity at all.

"If this is the twin brother and if he has in any way intimated to the Jury that he is a twin of the plaintiff, then the damage, I think, is readily apparent."

The trial court promptly called the man referred to into chambers and proceeded to interrogate him. He identified himself as Arthur Molton and stated that he had, in fact, talked to some of the jurors during recess and that the conversations with them concerned fishing and mining and that at no time had he discussed the case with members of the jury. He also stated that in response to a juror's inquiry he had answered that he was the plaintiff's twin brother. Thereafter, the defendant's counsel stated the following:

"*Mr. Tilly:* And I think the brother probably purely honestly was discussing things which had no bearing on the case, and probably because of a family resemblance was asked, rather than he volunteering the information. But I think at this point the fact that he has revealed he was the twin of the plaintiff enables the Jury to draw a conclusion which is wholly unwarranted by the evidence, as to their difference in their appearance, because they obviously do not appear the same now.

"And under these circumstances I would request that

the Court specifically advise the Jury at the incoming of Court here this morning that it has come to the Court's attention that a spectator has identified himself, whether on request or otherwise, to certain of the Jurors, as the twin of the plaintiff and that due to the absence of any evidence whatsoever concerning their similarity or resemblance otherwise, the Jury are not to draw any conclusions whatsoever from that."

The trial court refused to accede to the defendant's request, deciding that no damage had been done and reasoning that an admonition to the jury would do more harm to the defendant's case than merely leaving the matter as it was. The record discloses that Arthur Molton was not listed as a witness for the plaintiff in the pre-trial order and that he was not called to testify during the trial. The defendant did not move for a mistrial.

The defendant cites *Butters v. Wann,* 147 Colo. 352, 363 P. (2d) 494, in support of its contention that on these facts it was entitled to a new trial. Even a cursory reading of the *Butters* case will disclose that it is distinguishable on its facts from the case at bar. There a juror instigated a conversation with a third party and discussed issues directly bearing upon the case.

In the case at bar, the defendant's counsel himself admitted that Arthur Molton did not discuss matters having a bearing on the issues. The defendant's speculations as to the effect of Arthur Molton's conversations with members of the jury are simply not supported by the record. No question has been raised as to the serious nature of the injury that the plaintiff incurred nor does the defendant contend that the verdict was excessive in amount except for the statutory limitation provided in C.R.S. '53, 80-6-4, a contention of which we have here previously disposed. There is nothing in the record from which to infer that the defendant was in any way prejudiced by the conversations of the jurors with Arthur

228

Molton, and the trial court did not err in refusing to grant a new trial on this ground.

The judgment is affirmed.

MR. CHIEF JUSTICE MCWILLIAMS and MR. JUSTICE SUTTON concur.