## No. 21996.

NORTHWESTERN ENGINEERING COMPANY *v.* EDEMIA ROOKS, INDIVIDUALLY AND JOSEPH L. RAY ROOKS AND JAMES RUSSELL ROOKS, BY EDEMIA ROOKS, THEIR MOTHER AND NEXT FRIEND, THE WESTERN CASUALTY AND SURETY COMPANY, A CORPORATION, AND JOHN SHEETS.

## No. 21998.

JOHN SHEETS *v.* EDEMIA ROOKS, INDIVIDUALLY AND JOSEPH L. RAY ROOKS AND JAMES RUSSELL ROOKS, BY EDEMIA ROOKS THEIR MOTHER AND NEXT FRIEND, THE WESTERN CASUALTY AND SURETY COMPANY, A CORPORATION.

(443 P.2d 977)

Decided July 15, 1968.    Opinion modified and as modified rehearing denied August 19, 1968.

298

ZARLENGO, MOTT AND CARLIN, for plaintiff in error (No. 21996).

COIT, GRAHAM & WEBSTER, for defendants in error Edemia Rooks, Joseph L. Ray Rooks and James Russell Rooks (No. 21996 and No. 21998).

HART D. GILCHRIST and E. B. HAMILTON, for defendant in error The Western Casualty and Surety Company (No. 21996 and No. 21998).

BRADFORD, McDANIEL & MAYNES, FRANK J. ANESI, for defendant in error John Sheets (No. 21996), and for plaintiff in error John Sheets (No. 21998).

*In Department.*

Opinion by MR. JUSTICE GROVES.

THIS is an action for damages resulting from the alleged wrongful death of Russell Rooks, hereinafter referred to as Rooks. The plaintiffs, herein referred to as such, are the widow and two sons of Rooks. Reference is made to the other parties as follows: Northwestern Engineering Company as Northwestern, Western Casualty and Surety Company as Western Casualty, and John Sheets as Sheets.

Northwestern was engaged in highway construction near Durango, Colorado. It had ordered concrete pipe from a supplier and had instructed it to include a pipe hook with the shipment. The pipe was delivered to the job site by Kerr Truck Company, hereinafter referred to as Kerr, on Kerr's truck driven by Rooks, Kerr's employee. The pipe was to be unloaded with Northwestern's crane, which at the time of the arrival of the pipe

Northwestern was using as a dragline, *i.e.*, was digging with a bucket. This bucket was connected with a shackle to the cable which proceeded over and down from the sheave wheel at the top end of the crane boom. Upon the arrival of Rooks with the load of pipe, the bucket was detached and the crane brought to the place at which the pipe was to be unloaded. Northwestern's foreman, Rowe, told Rooks where to park the truck. When the crane was placed in position behind the truck, its cab and boom were facing away from the truck. Rowe inquired of Rooks as to whether he had brought the pipe hook, and Rooks replied in the affirmative. Rowe, Rooks and Brown, who was employed by Northwestern as an oiler on the crane, brought the hook from behind the cab of the truck to the rear of the truck. For connection of the hook it was concluded to use the shackle attached to the crane cable rather than the shackle attached to the hook; so Brown and Rooks commenced removal of the shackle from the hook, with Rowe watching.

Sheets, Northwestern's crane operator, rotated the cab and boom in order to place the boom in position for unloading. As the boom approached the men working on the hook, Rooks took a few steps toward the crane cable, and grabbed it. By that time the boom had come in contact with a power line and Rooks was electrocuted when he touched the cable.

Kerr was insured by Western Casualty under a policy which provided for the payment of all sums which the "insured" should be legally obligated to pay as damages because of use of the truck. Among the definitions of "insured" was that of "any person while using the automobile," and the policy provided that "Use of the automobile for the purposes stated includes the loading and unloading thereof."

Plaintiffs brought the action against Northwestern and Sheets, alleging negligence on the part of each. Northwestern and Sheets brought Western Casualty into the case by separate third party complaints, alleging that

under Western Casualty's policy on the Kerr truck, Western Casualty should have taken over defense of the case and should pay any judgment that might be recovered by the plaintiffs. Northwestern filed a cross-claim against Sheets for judgment against him for whatever might be recovered against Northwestern. The case was tried to the court without a jury and judgment was rendered in favor of the plaintiffs and against Northwestern and Sheets in the amount of $25,000 plus interest from the date of filing of the action. The trial court ruled in favor of Western Casualty with respect to the claims of Northwestern and Sheets and in favor of Sheets with respect to the claim against him by Northwestern. To review these rulings, Northwestern sued out a writ of error. Sheets sued out a similar writ of error and the two proceedings were consolidated.

Northwestern has presented three questions:

(1) Whether Western Casualty is liable to it.

(2) Whether the judgment should be in an amount not in excess of $10,000 by virtue of the Colorado Employers Liability Act as then in effect.

(3) Whether Northwestern should recover against Sheets.

We answer each question in the negative.

## I.

One portion of Western Casualty's brief seems to imply that operation or use of the truck would have to be involved in order for Northwestern to be an "insured" under the policy and, even if "unloading" had commenced, the negligent operation of the crane could not be considered use of the truck. We do not pass on this and, for the purpose of this decision, assume that, if Northwestern had commenced the "unloading" of the pipe, it would be insured under the Western Casualty policy. Therefore, the answer to the first question depends upon the correctness of the trial court's finding that "unloading" by Northwestern, as the term is used in the policy, had not yet commenced.

Many of the cases cited in the briefs are to be found in the annotations appearing in 160 A.L.R. 1259 and 95 A.L.R.2d 1122. Most of the cases, and all but two of those cited by Northwestern, involve negligence of the named insured. Nearly all of the cases which involve unloading are concerned with whether the unloading operation had *terminated* by the time of the accident.

The annotations and cases bring out three things:

(1) There are two doctrines, namely, the "coming to rest" doctrine and the "complete operation" doctrine;

(2) *as is generally true in the construction and inter-*pretation of insurance contracts, the intention of the parties to the contract is controlling; and

(3) that each case must be decided upon an *ad hoc* basis.

▐ Under the "coming to rest" doctrine, "unloading" comprises only the actual removing or lifting of the article from the loaded vehicle to the moment when it again comes to rest. The "complete operation" doctrine embraces the entire process involved in the movement of goods from the time they are given into the insured's possession until the insured has completed delivery thereof. See Annot., 95 A.L.R.2d 1129. Under either doctrine there must be some act on the part of a person, other than the named insured, to cause commencement of coverage of such person. It is urged that coverage of Northwestern was in effect while the boom was being swung around because this was a preparatory step to unloading. If this be true, then coverage must have commenced at the time the crane ceased digging and detachment of the bucket was commenced; and, if then one of Northwestern's employees on the crane negligently operated it, causing injury or death to someone, Northwestern would be insured by Western Casualty with respect to the matter. We do not believe that this was the intent of the provisions of the policy.

▐ The trial court found that "unloading" could not commence until the pipe hook had been attached to the

crane cable. This finding must of necessity be with respect to the acts of Northwestern *in the operation of the crane.* So far as the crane operation was concerned, the removal of the hook from the truck did not mark the commencement of "unloading"; and, for there to be a causative relationship of the crane to the insurance coverage of one other than the named insured, the pipe hook first would have had to have been attached. See *Travelers Insurance Company v. Buckeye Union Casualty Company,* 172 Ohio St. 507, 178 N.E.2d 792.

II.

Northwestern contends that, under the authority of *Jacobson v. Doan,* 136 Colo. 496, 319 P.2d 975, Rooks was a loaned employee at the time of the accident to Northwestern and under its control. It argues, therefore, under the Employers Liability Act the plaintiff's damages should have been limited to $10,000. The Act, *inter alia* (C.R.S. 1963, 80-5-1), provides:

"Every corporation or individual who may employ agents, servants or employees, such agents, servants, or employees being in the exercise of due care, shall be liable to respond in damages for injuries or death sustained by any such agent, servant or employee resulting from the carelessness, omission of duty or negligence of such employer, or which may have resulted from the carelessness, omission of duty or negligence of any other agent, servant or employee of the said employer, in the same manner and to the same extent as if the carelessness, omission of duty or negligence causing the injury or death was that of the employer."

The following section, in effect at the time of the accident, limited damages to a sum not exceeding $10,000. The plaintiffs have not raised the question as to whether the dependents of a loaned employee can sue his employer for wrongful death. Consequently, we will consider only the issue as presented in the briefs and on oral argument.

Northwestern argues that Rooks was under Northwestern's control because he followed orders given by Rowe. Rowe was the only witness to testify concerning this phase of the matter and his testimony was as follows:

"A. He (Rooks) came in with a load of pipe and wanted to know where it was to be unloaded, and I directed him to the place alongside the excavation at this particular point, and then he parked.

"Q. Now, were you there near the scene where he parked the truck?

"A. Yes.

"Q. And you told him exactly where to park the truck?

"A. Not exactly. I told him to park it so that the pipe could be unloaded on the south side of the ditch.

"Q. And he did so?

"A. Yes.

\* \* \*

"Q. Now, after the truck driver parked the truck, what happened next?

"A. I asked him if he had brought the hook to unload the pipe, and he said he had, and he got it from the truck. He had it chained down just behind the cab, and he got the hook and brought it to the rear of the truck.

"Q. Did he bring it by himself?

"A. No, I believe Mr. Brown and I both helped him carry it. It is quite heavy.

\* \* \*

"Q. Now, after this device which you have identified as a pipe hook was taken from the truck, what next was done with it?

"A. We placed it on the ground at the rear of the load of pipe and had decided to use the shackle which attached to the end of the hoist line of the crane rather than the one which you see on the hook here which you have described, and we set the hook upon the longer leg with the shorter one in a vertical position and were

removing the shackle preparatory to hooking the crane line.

"Q. Now, you say 'we.' Who was present at that time?

"A. Mr. Brown, Mr. Rooks and I.

"Q. You were all, as I understand it, gathered around this pipe hook. Is that right?

"A. Yes, that is right. I was more or less watching. They were doing the work. I was just watching.

"Q. What was Mr. Rooks doing?

"A. He was assisting in removing the shackle. I believe Mr. Brown was holding the hook in an upright position and Mr. Rooks was removing the shackle.

\* \* \*

"Q. Now, tell exactly what happened as the boom was being swung toward the two men with the pipe hook.

"A. Well, I knew the crane was swinging. Mr. Rooks jumped up, and then I grabbed the hook and he jumped up to catch the line on the crane. . . ."

In *Doan*, relied upon by Northwestern, Doan was an employee of the May Company; he was specifically directed by his superior to assist a freight company in unloading a certain shipment; The May Company supervisor left the scene and Doan came "under the supervision, direction and control" of the freight company personnel; and while so acting Doan was injured. Rooks' situation here is quite different. While he was assisting Rowe and Brown at the time of his death, there was no showing that his employer, Kerr, had ordered him to do so and it is apparent from Rowe's testimony that he did not bring himself under Rowe's orders and control. Consequently, he was not a loaned employee. See *Chartier v. Winslow*, 142 Colo. 294, 350 P.2d 1044.

## III.

Northwestern maintains that only Sheets was negligent, that the only basis for its liability to plaintiffs is under the doctrine of *respondeat superior* and that, therefore, it is entitled to contribution from Sheets. It

cites *Hamm v. Thompson,* 143 Colo. 298, 353 P.2d 73; *Parrish v. De Remer,* 117 Colo. 256, 187 P.2d 597; *Otis Elevator Co. v. Maryland Casualty Co.,* 95 Colo. 99, 33 P.2d 974; and *Spillane v. Wright,* 127 Colo. 580, 259 P.2d 1078. It appears that the only negligence chargeable to Northwestern is by virtue of *respondeat superior,* but it does not appear that only Sheets was negligent. Brown testified that prior to the time the boom was swung around he knew that the power line was on the east side of the boom, that he signaled to Sheets to swing to the west and that Sheets swung it to the east. Rowe testified that he was present at the time. There is nothing in the testimony to indicate that either Brown or Rowe made any effort to stop Sheets from swinging the boom toward the power line.

██ The evidence would support a finding that Northwestern had not established by a preponderance of the evidence that the negligence of Sheets was the sole cause of the injury and even a finding that there was negligence on the part of Brown or Rowe or both. In *Parrish v. DeRemer, supra,* there is a summary of the general principles announced in *Colorado & Southern Railway Co. v. Western Light & Power Co.,* 73 Colo. 107, 214 P. 30. A portion of this summary is as follows: "4. One who has been charged with negligence as to another, and for which judgment has been entered and paid, may maintain an action against a joint tort-feasor for indemnification if he can establish by a preponderance of the evidence that the sole, proximate and primary cause of the injury and resultant judgment was the negligence of his joint-feasor."

This principle was followed in *Otis Elevator Co. v. Maryland Casualty Co., supra,* and we find nothing in *Hamm v. Thompson, supra,* in conflict therewith. We conclude that the trial court's finding that Northwestern was not entitled to recover against Sheets must have been based upon the trial court's conclusion that Sheets' negligence was not, or at least was not established by a

preponderance of the evidence to be, the sole cause of the injury.

The judgment is affirmed.

MR. CHIEF JUSTICE MOORE and MR. JUSTICE MCWILLIAMS concur.