532 P.2d 372 (1974)
Opal C. BARKER, Individually, and as Conservatrix of the Estate of Jack Barker, also known as Jack Lee Barker, Mental Incompetent, Plaintiff-Appellee,
v.
COLORADO REGION-SPORTS CAR CLUB OF AMERICA, INC., a Colorado corporation, et al., Defendants-Appellants.
No. 73-265.
Colorado Court of Appeals, Div. II.
December 3, 1974.
Rehearing Denied December 24, 1974.
Certiorari Denied March 17, 1975.
*374 Carrigan & Bragg, P.C., James R. Carrigan and Douglas E. Bragg, Denver, Friedman, *375 Bader & Dufty, Robert A. Dufty, Denver, for plaintiffs-appellees.
Yegge, Hall & Evans, Don R. Evans, Denver, for defendants-appellants.
Selected for Official Publication.
KELLY, Judge.
The defendants, Colorado Region-Sports Car Club of America, Inc., Alex S. Keller, Churchill Blackwell and Joyce S. Steinhardt, as successor special administratrix of the estate of James E. Mulhall, Jr., appeal from adverse judgments in a negligence action brought by Opal C. Barker, individually, for loss of consortium and by Opal Barker, as conservatrix of the estate of her husband, Jack Barker. We affirm.
This lawsuit arose out of a bizarre accident during an auto race at Continental Divide Raceways (CDR) on June 8, 1969. The event was sponsored by Colorado Region-Sports Car Club of America, Inc. (Club). Alex S. Keller, chief steward of the meet, was solely responsible for its overall conduct and Churchill Blackwell was the racing steward. It was Blackwell's duty to assure that orders given by Keller were carried out. As a result of the accident, James E. Mulhall, Jr., the driver of the ill-fated race car, was killed. Jack Barker, a spectator in the permanent pit area of the track, received severe head injuries.
After trial of the liability issues, the jury, by special verdict found that Mulhall and Blackwell were guilty of simple negligence, that Keller's negligence was willful and wanton, that the negligence of each was a proximate cause of the injuries to Barker, and that Barker did not assume the risk of his injuries. The damages issues were then tried to the same jury, which awarded $602,000 to Mrs. Barker as conservatrix and $150,000 to her individually.
The defendants appeal from the judgments entered on these verdicts, their contentions centering almost entirely on the refusal of the trial court to take the case from the jury and determine the liability issues in their favor as matters of law. The defendants urge that an exculpatory agreement signed by Barker is an absolute bar to Mrs. Barker's recovery, whether she sues as conservatrix or for loss of consortium. They contend this is true whether defendants' negligence be simple or wanton. They assert that the evidence was wholly inadequate to support the jury's findings of negligence and proximate cause, but that it was abundant for the purpose of establishing Barker's assumption of risk. Finally, they postulate that the damages awarded were miscalculated and were unsubstantiated by the evidence.
The basic facts are not in dispute. The permanent pit at CDR, an area reserved for pit crew members and a limited number of spectators, was situated about twenty feet behind the racing pits. The permanent pit was separated from the racing pits by wooden posts supporting an eight-inch steel "Armco" guard rail. The racing pits were located on an exceptionally wide, straightaway portion of the track. Drivers leaving the track during a race reached the racing pits by way of the pit lane. The racing pits and pit lane were marked off from the race track by a long line of fifty-five gallon steel oil-drums (referred to in the testimony as barrels), which were connected by a steel cable laced through hooks welded to the barrels. The purpose of this barrel barrier was twofold: (1) to mark the racing pits and pit lane and (2) to provide protection to drivers' pit crew members and others in the racing pits and permanent pit.
Spectators were permitted in the permanent pit area at CDR only after signing an exculpatory agreement releasing the sponsors of the event, its officials and participants from liability for injury, whether caused by negligence or otherwise. Only signatories were given a pit pass. Jack Barker was a spectator in the permanent pit on Sunday, June 8, having signed the exculpatory agreement and received a pit pass authorizing his admission to that area. He wore the construction worker's hard hat without which he was seldom seen. *376 Barker, himself an occasional race car driver, frequently attended CDR races, which he nearly always watched from the permanent pit area where his brother worked as an auto mechanic.
Late Sunday afternoon, June 8, 1969, James Mulhall was driving in the main event for Formula A cars, high horsepowered, single-engine, open-wheeled race cars with fiberglass and aluminum bodies. It had been raining hard for about a half an hour and the asphalt track was treacherous. One of Mulhall's pit crew members signalled Mulhall to slow down. Mulhall acknowledged this signal by raising his right hand from the steering wheel. His car immediately went out of control, did a 180-degree spin toward the barrel barrier, struck the barrier, slid backwards along the barrel line and then through the steel cable into the pit lane, ultimately coming to rest in a dirt patch at the northernmost end of the straightaway. Several barrels in the barrier line were projected into the permanent pit. One barrel struck Jack Barker's head, leaving its indelible imprint on his hard hat.
Subsequent investigation of the accident revealed that not all the barrels in the barrier line had been filled with water, as was customary at CDR and as Keller had previously ordered them to be. Keller, a man with fifteen years' experience in racing, testified the sport was "perhaps the most dangerous in the world"; he knew that there was special hazard for people in the racing pits and in the permanent pit; and that filling all the barrels with water would provide them with some additional protection.
On Saturday morning, the day before the accident, Keller noticed that the barrels had not been filled with water. He talked to Churchill Blackwell about this and directed Blackwell to see that all the barrels were completely filled with water. Blackwell protested that the task would be difficult because of the scheduling of the races that day and the non-availability of anything but a garden hose with which to transport water. Blackwell observed that he was not going to stand out there all night filling barrels, a comment he repeated on Sunday morning when Keller inquired about the progress of the job. Blackwell, in responding to Keller's inquiry, reported that not all the barrels had been filled and again pointed out the obstacles. Keller replied that the work could be resumed during the lunch hour. Although Keller did not recall it, two witnesses testified that Keller told Blackwell not to worry about it, there had never been an accident at CDR before and Keller didn't think there would be one that day.
Neither Blackwell nor Keller checked all the barrels to see that they were filled. Of the fifty to sixty barrels in the line, Keller checked three or four, found them filled and assumed that his subordinates had done what he had directed them to do. Blackwell checked the northernmost barrel in the line and found that it had water in it. The other barrels at the north end of the pit lane were empty.

I. The Exculpatory Agreement

Defendants argue that the exculpatory agreement signed by Barker is an absolute bar to recovery both by his estate and by his wife, individually. If this contention has merit, the remaining issues in the case are academic. Mrs. Barker counters defendants' contention with the argument that the exculpatory agreement is totally void as against public policy. The trial court ruled that the agreement did not bar recovery by Mrs. Barker individually for loss of consortium and that it precluded recovery by Barker's estate for simple negligence only. We agree.
The effect of an exculpatory agreement has not been addressed in Colorado in precisely this context. In those cases in which the question has been considered, Colorado adheres to the general rule that exemption agreements are against public policy where a public service is involved. See e.g., Denver Union Terminal Ry. Co. v. Cullinan, 72 Colo. 248, 210 P. 602; The *377 Denver Consolidated Electric Co. v. Lawrence, 31 Colo. 301, 73 P. 39.
The rule is not without qualifications. Common carriers, for example, may contract for exemption from liability for negligence with respect to duties they are under no obligation to the public to perform. See Union Pacific R. R. Co. v. Stupeck, 50 Colo. 151, 114 P. 646; The Denver & Rio Grande R. R. Co. v. Whan, 39 Colo. 230, 89 P. 39. There has also been qualified departure from the general rule that limitations of liability in contracts of bailment for hire are against public policy. See Jefferson County Bank v. Armored Motors Service, 148 Colo. 343, 366 P.2d 134.
In none of these cases was there blanket disapproval of all exculpatory agreements as violative of public policy.[1] The decisive factors in each case have been the language of the agreement, the nature of the service performed and the duty owed to the public. See Otis Elevator Co. v. Maryland Casualty Co., 95 Colo. 99, 33 P.2d 974.
We conclude that Colorado follows the general rule that, in the absence of a duty to the public, exculpatory agreements are valid when fairly made and may be enforced to preclude recovery for injury caused by simple negligence. Such agreements, however, must be strictly construed against the party seeking their exemption, and in no event may a person be relieved of liability for willful and wanton negligence. See 6A A. Corbin, Contracts § 1472; W. Prosser, Torts § 68 (4th ed.); 15 S. Williston, Contracts § 1823 (W. Jaeger 3rd ed.); and see Otis Elevator Co. v. Maryland Casualty Co., supra, in which the court in dictum expressed its aversion to relieving the maker of the contract from liability for "wanton carelessness"; and Hawes v. Central of Georgia Ry. Co., 117 Ga.App.771, 162 S.E.2d 14.
The application of these rules to an exculpatory agreement signed by a patron of a recreational facility is supported by the cases from other jurisdictions. In Lee v. Allied Sports Associates, Inc., 349 Mass. 544, 209 N.E.2d 329, which involved the effect of a "release sheet" signed by the plaintiff to gain admission to the pit area of a race track, the Supreme Judicial Court of Massachusetts held that the "release sheet" was an enforceable contract exempting the defendant from liability for simple negligence. Cf. Celli v. Sports Car Club of America, Inc., 29 Cal.App.3d 652, 105 Cal.Rptr. 904.
The New York Court of Appeals, in Ciofalo v. Vic Tanney Gyms, Inc., 10 N.Y.2d 294, 177 N.E.2d 925, stated what we believe to be the proper principles to be applied to sports and similar recreational activities:
"Although exculpatory clauses in a contract intended to insulate one of the parties from liability resulting from his own negligence, are closely scrutinized, they are enforced, but with a number of qualifications. Whether or not such provisions, when properly expressed, will be given effect depends upon the legal relationship between the contracting parties and the interest of the public therein.
. . .
"[W]here the intention of the parties is expressed in sufficiently clear and unequivocal language . . . and it does not come within any of the . . . categories where the public interest is directly involved, a provision absolving a party from his own negligent acts will be given effect....
......
"The wording of the contract in the instant case expresses as clearly as language can the intention of the parties to completely insulate the defendant from liability for injuries sustained by plaintiff by reason of defendant's own negligence, and, in the face of the allegation of the complaint charging merely ordinary negligence, such agreement is valid.

*378 "Here there is no special legal relationship and no overriding public interest which demand that this contract provision, voluntarily entered into by competent parties, should be rendered ineffectual.. . . "
We are satisfied also that an exculpatory agreement does not constitute an express assumption of risk by a signatory. Cf. Hook v. Lakeside Park Co., 142 Colo. 277, 351 P.2d 261; see Friedman v. Lockheed Aircraft Corp., 138 F.Supp. 530 (E. D.N.Y.); and Celli v. Sports Car Club of America, Inc., 29 Cal.App.3d 652, 105 Cal. Rptr. 904, (in which similar contentions were expressly rejected). Nor has it any effect whatsoever on Mrs. Barker's claim for loss of consortium. It does not relieve defendants of liability to Mrs. Barker, even for their simple negligence. We regard Crouch v. West, 29 Colo.App. 72, 477 P.2d 805, as dispositive of this issue.

II. Negligence

In considering the evidentiary support for the jury's findings of negligence, proximate cause and the absence of assumption of risk, we are bound by the settled rule. These are questions of law for the court only in the clearest of cases, when the facts are undisputed, and it is plain that all intelligent persons can draw but one inference from them. Seward v. York, 124 Colo. 512, 239 P.2d 301.
Although the evidence was conflicting, there was testimony that the proper method of acknowledging a signal to slow down was a nod of the head or a wave of a finger only, and not raising the hand from the steering wheel, as Mulhall did. On this state of the evidence, the jury was warranted in finding that Mulhall was guilty of simple negligence in not using the accepted method of responding to his pit crew member's signal, particularly since Mulhall was an experienced driver of a fast and powerful car on an unusually hazardous track.
The evidence of Blackwell's negligence was virtually undisputed. The task of filling the fifty to sixty barrels in the barrier line had been entrusted to Blackwell's care. It was a job he protested from the beginning and one he failed to accomplish. His negligence was amply established.
Whether there was sufficient evidence to support the jury's finding that Keller was guilty of willful and wanton negligence presents a closer question. There is a presumption on appeal that the proof sustains the verdict, McCarthy v. Eddings, 109 Colo. 526, 127 P.2d 883, and it is our duty to view the evidence in the light most favorable to the plaintiff's case, drawing every inference fairly deducible in favor of the judgment. J & K Construction Co. v. Molton, 154 Colo. 214, 390 P.2d 68. We are not at liberty to reverse the judgment because we might reach a different result on our review of the record. See Seifried v. Mosher, 129 Colo. 156, 268 P.2d 411.
Keller testified that he had been involved in racing since 1954 and it was apparent from his testimony that he had an expert's knowledge of the sport. He had held official positions in the Sports Car Club of America, both nationally and regionally, and was thoroughly familiar with the regulations governing racing events.
Keller knew, on Saturday morning, that the barrels had not been filled with water. He knew the danger to drivers and to people in the pit areas from unstable, empty barrels in the barrier line and it was for that reason he ordered them to be filled. Yet, when it was reported to him on Sunday morning that all the barrels had not been filled, two witnesses said that Keller told his subordinates not to worry about it, there had never been an accident at CDR and he did not think there would be one that day. This could be considered by the jury as tantamount to a countermand of his previous order to fill the barrels and was sufficient, when taken together with *379 the other evidence, to support the jury's finding that Keller purposefully committed an affirmative act which he knew was dangerous to another's person and which he performed heedlessly, without regard to the consequences or rights and safety of another's person.

III. Proximate Cause

Defendants' argument that their negligence was not the proximate cause of Barker's injuries is predicated on the proposition that the jury must find the conduct of each defendant to be the sole proximate cause of the injuries. To state the argument is to refute it. In Reaves v. Horton, Colo.App., 518 P.2d 1380, reversed on other grounds, Horton v. Reaves, Colo., 526 P.2d 304, we said:
"In a negligence action, there may be more than one proximate cause of the plaintiff's injuries, but any given defendant may be found responsible for the damages if his negligent acts, or failure to act, were a proximate cause of the injuries."
See Colorado Jury Instructions 9:26; Moore v. Standard Co., 145 Colo. 151, 358 P.2d 33.
It is apparent from the evidence we have already recited that Mulhall's negligence was a proximate cause of Barker's injuries. And contrary to the assertions of Keller and Blackwell, there was more than enough evidence to substantiate the jury's circumstantial inference that it was a barrel which hit Barker's head. The condition of his hard hat alone was enough to justify the inference. It bore the unmistakable imprint of the barrel's bunghole.
Defendants Keller and Blackwell also urge that there was insufficient evidence of proximate cause because there was no evidence that Barker was hit by an empty barrel as opposed to a full or partially full barrel. We consider it unimportant whether Barker was struck by an empty barrel, a full barrel or a partially full barrel. The inference that Barker was hit by a barrel, whatever its contents, was irresistible. Filling the barrels in the barrier line with water was intended to increase the stability of the entire barrier so that the impact of a fast-moving vehicle would be absorbed and transferred from one barrel to another along the connecting steel cable to the end of the barrier line. The jury was fully justified in concluding that, but for the failure of Keller and Blackwell to see that all the barrels were completely filled with water, no barrel, whether empty or otherwise, would have been propelled through the air and into the permanent pit.

IV. Assumption of Risk

Defendants' contention that Barker assumed the risk as a matter of law is not substantiated by the record. To have assumed the risk, a person must be conscious of a risk knowingly undertaken, and this question is ordinarily one for the jury. Cox v. Johnston, 139 Colo. 376, 339 P.2d 989. Although Barker had some knowledge of the generally dangerous nature of the sport and voluntarily exposed himself to some risk of injury simply by viewing the races from the permanent pit area, there is absolutely no evidence that Barker knew the barrels had not been filled with water or that if he had known, he would have appreciated the peril resulting from their empty condition.
Moreover, Barker's brother testified that it was customary at CDR to fill the barrels in the barrier with water once a year, in the spring. Since the two brothers were frequent companions at CDR races, the jury could reasonably infer that Jack Barker relied on the custom of filling the barrels and did not appreciate the danger and risk involved in watching the races from the permanent pit. There being sufficient evidence to raise a question as to Barker's knowledge and prudence, the issue of assumption of risk was properly submitted to the jury for determination. Its resolution of that issue will not be disturbed on review.

*380 V. Damages

We need not consider defendants' contentions that the damages were miscalculated and were unsubstantiated by the evidence. Even if this were so, the defendants failed to bring these alleged deficiencies to the attention of the trial court in their motion for new trial. Only those questions presented in the motion for new trial will be considered on appeal. C.R.C. P. 59(f); Furer v. Allied Steel, 174 Colo. 171, 483 P.2d 212.
Judgment affirmed.
ENOCH and RULAND, JJ., concur.
NOTES
[1] We do not regard the Supreme Court's refusal to "give legal significance to the express waiver which was printed on the ticket" in Hook v. Lakeside Park Co., 142 Colo. 277, 351 P.2d 261, as an interpretation of the effect of exculpatory agreements.