# United States Court of Appeals

## For the First Circuit

No. 07-2654

IAN J. BROWN; JAMES BROWN; BARBARA BROWN,

Plaintiffs, Appellants,

v.

UNITED STATES;
BOSTON EDISON COMPANY, d/b/a NSTAR ELECTRIC,

Defendants, Appellees,

VERIZON NEW ENGLAND, INC.,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,

Lipez and Howard, Circuit Judges.

Scott E. Charnas, with whom Charnas Law Firm, PC was on brief, for appellants.
Michael K. Callahan, with whom Marissa A. Goldberg, was on brief for appellee Boston Edison Company d/b/a NSTAR Electric.
Anita Johnson, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee United States.

February 19, 2009

**HOWARD**, **Circuit Judge**.    Ian Brown suffered serious injuries in a motorcycle accident that occurred near Hartwell Road in Bedford, Massachusetts.  Brown's injuries, which resulted from his collision with a utility pole located off the edge of the road and on the "road-side" of a guardrail, left him a paraplegic.

Brown and his parents (for convenience, "Brown") brought a negligence action against Boston Edison, a utility company, and the United States.[1]  Brown claimed that both parties were liable for his injuries because both allowed a dangerous condition -- the utility pole's location on the road-side of the guardrail -- to exist off the edge of Hartwell Road.

The district court granted the defendants' summary judgment motions, concluding that neither the United States nor Boston Edison owed a duty of care to Brown.  The court determined that the United States owed no duty to Brown because the Town of Bedford, and not the United States, owned or controlled Hartwell Road.  As a result, the court concluded that the United States was not responsible for maintaining the road and its appurtenances in a safe condition.  As for Boston Edison, the court concluded that

---

[1] The district court had jurisdiction over Brown's claims as follows.  Brown's claim against the United States was brought under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).  Brown's claim against Boston Edison was based on diversity of citizenship -- Brown is a citizen of the State of New Jersey and Boston Edison is a New York corporation with a principal place of business in Massachusetts.  See 28 U.S.C. § 1332.  The claim against Boston Edison involved an amount in controversy exceeding $75,000.  Id.

it owed no duty to Brown because Brown's accident was not reasonably foreseeable. Brown appeals the district court's rulings.[2] We affirm.

## I. Facts

We provide most of the facts here, reserving some for our discussion of the appellate claims. Because we are reviewing the district court's grant of summary judgment to the defendants, we present these facts in the light most favorable to Brown. See Rodi v. S. New Eng. Sch. of Law, 532 F.3d 11, 13 (1st Cir. 2008).

### The Pole

In 1916, the Town of Bedford granted Boston Edison the right to install a pole line along Hartwell Road. Among the poles installed was Pole 16/37 ("Pole 16" or "pole") -- the pole at issue. Boston Edison placed Pole 16 thirteen inches off of a curved portion of Hartwell Road. As the years passed, Boston Edison replaced Pole 16, which was made of wood, on a periodic basis. Specifically, Boston Edison replaced the pole in 1929, 1954 and 1964. So far as is known, however, the position of the pole never changed. In approximately 1990, an unknown third party placed a guardrail along Hartwell Road. Standing between the road and the guardrail was Pole 16.

---

[2] The district court alternatively held that Brown's claim against Boston Edison was barred by Massachusetts' statute of repose, MASS. GEN. LAWS ch. 260, § 2B.

-3-

**The Accident**

At the time of the accident Brown was an Air Force Lieutenant stationed at Hanscom Air Force base. The base is located on land bordering Hartwell Road that is owned by the United States. The accident occurred as Brown was traveling to Hanscom on his motorcycle via Hartwell Road. Brown, proceeding at a speed of approximately twenty-five miles per hour, hit a depression in the road, which caused him to lose control of his motorcycle. Leaping from the motorcycle, Brown chose the guardrail as an aim point for his body. The guardrail, however, channeled Brown headfirst into Pole 16. Although there was no evidence that the pole had ever been struck prior to Brown's accident, Bedford Town police logs revealed that, in the eight years preceding Brown's accident, twenty-eight accidents had occurred in the vicinity of the pole.

## II. Discussion

We review a court's grant of summary judgment de novo. Bogan v. City of Boston, 489 F.3d 417, 424 (1st Cir. 2007). In this case, Massachusetts law applies to both of Brown's claims. See Magarian v. Hawkins, 321 F.3d 235, 238 n.4 (1st Cir. 2003); Soto v. United States, 11 F.3d 15, 17 (1st Cir. 1993).

To prevail in a negligence action under Massachusetts law, a plaintiff must prove that (1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached

this duty; (3) damage to the plaintiff resulted; and (4) the breach of the duty caused this damage. Jupin v. Kask, 849 N.E.2d 829, 835 (Mass. 2006). Typically, whether a plaintiff has satisfied the last three elements is for a jury to decide. Id. Whether the defendant owes any duty in the first place, however, is a question of law and, therefore, grist for the summary judgment mill. Afarian v. Mass. Elec. Co., 866 N.E.2d 901, 905 (Mass. 2007) ("The existence of a legal duty is a question of law appropriate for resolution by summary judgment."). Central to Brown's claims against the United States and Boston Edison is the question of whether either party owed him a duty of care.

Generally, a duty of care exists under Massachusetts law where the resulting harm was "reasonably foreseeable." Jupin, 849 N.E.2d at 835. More specifically, where an actor is able to foresee that his conduct could cause harm to others, he is charged with a duty to exercise reasonable care to avoid this harm. Id. ("To the extent that a legal standard does exist for determining the existence of a tort duty . . ., it is a test of the 'reasonable foreseeability' of the harm.") (citation and internal quotation marks omitted); see also Glick v. Prince Italian Foods of Saugus, Inc., 514 N.E.2d 100, 102 (Mass. App. Ct. 1987) ("There is no duty owed when the risk which results in the plaintiff's injury is not

one which could be reasonably anticipated by the defendant.").[3] With this general terrain mapped, we turn first to Brown's claim against the United States.

Brown's negligence claim against the United States is premised on his contention that the United States owned and controlled Hartwell Road -- the road off of which he was injured. Control is the key as, under Massachusetts law, "it is elementary that liability for damage caused by the condition of premises commonly depends upon control of the offending instrumentality, either through ownership or otherwise." Underhill v. Shactman, 151 N.E.2d 287, 290 (Mass. 1958) (citation omitted); see also McIntyre v. Boston Redevelopment Auth., 595 N.E.2d 334, 336 (Mass. App. Ct. 1992)("[T]he critical test is who had the right to control the property.").

Despite Brown's contention to the contrary, the record evidence overwhelmingly supports the district court's conclusion that the Town of Bedford, and not the United States, controlled

_____

[3] Massachusetts courts have also defined duty in more abstract terms. See Luoni v. Berube, 729 N.E.2d 1108, 1113 (Mass. 2000) ("The concept of 'duty' . . . 'is not sacrosanct in itself, but is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection . . . . No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.'") (citation omitted); Mullins v. Pine Manor Coll., 449 N.E.2d 331, 335 (Mass. 1983) ("[A] duty finds its 'source in existing social values and customs.'") (citation omitted).

Hartwell Road either through ownership or otherwise. Several pieces of evidence stand out.

First, a sworn declaration and a deed both indicate that the Town of Bedford actually owned Hartwell Road. The United States' title expert, after examining a multitude of records including those of the Bedford Town Clerk, testified that the Town of Bedford took title to Hartwell Road in 1734-35. A 1952 deed from the Commonwealth of Massachusetts, while granting the United States fee ownership of the land surrounding Hartwell Road, explicitly excluded "all public or private roads, right[s] of way and/or easements now existing within the said boundaries . . . ."[4]

In addition, the sworn deposition testimony of four witnesses leads to the conclusion that the Town of Bedford controlled Hartwell Road. A witness responsible for maintaining the grounds and roads at Hanscom for decades testified that the Town of Bedford has always maintained Hartwell Road and that the employees at Hanscom had never maintained or done anything to the road. An eighteen-year employee of the Town's Department of Public Works testified that the Town maintains Hartwell Road and is responsible for law enforcement on the road. With respect to the Town's maintenance of the road, this witness noted that the Town

---

[4] The land transferred in the 1952 deed was later divided into two separate portions in 1977, with the Navy taking "Parcel B," the portion closest to the accident site. The Air Force retained the other parcel.

sweeps, plows, and paves the road, in addition to painting its street lines and filling its potholes. A previous Bedford Town foreman who had worked in Bedford's Highway and Grounds Division testified similarly regarding the Town's maintenance of Hartwell Road. Finally, the United States' title expert testified that the Town of Bedford installed a sewer line under the road around 1958.

Finally, the declarations of two government employees support the United States' position. A civilian employee of the United States Air Force, responsible for overseeing the real property for the Air Force facilities at Hanscom Air Force base, testified that "no agency of the federal government owns or has owned or maintained Hartwell Road and its shoulders." A civilian employee of the United States Navy, responsible for managing the Navy's portion of the Hanscom land, testified that the road was used as a public road and that the Navy "did no maintenance, construction, planning, public safety, or law enforcement work with regard to the road."

Faced with this substantial evidence, Brown nevertheless argues that two other pieces of evidence turn the issue of control into a question for the jury. After closer examination of this evidence, we disagree.

Brown offers the affidavit of a licensed attorney, who opined that the Town of Bedford has merely an easement interest in Hartwell Road and that the United States is the fee owner of the

road. Even if this testimony were enough to put the ownership of Hartwell Road into question, the distinction made in the affidavit is immaterial. As detailed above, the record evidence makes manifest that the Town of Bedford exercised control over Hartwell Road in every conceivable sense.

Brown also offers the deposition of Arthur Hayes, an Air Force specialist in cartography and real estate. Hayes testified that the Navy owns the land upon which Pole 16 stands. This testimony, however, does not create a question of material fact for two reasons. First, Hayes's testimony as to ownership suffers from an inherent flaw. It is based primarily on the 1952 deed that transferred ownership of the Hanscom land from the Commonwealth of Massachusetts to the United States. As detailed above, this deed explicitly excluded "all public or private roads, right of way and/or easements now existing." Second, and again, even if a material fact existed as to the ownership of Hartwell Road, the record evidence plainly shows that the Town of Bedford controlled Hartwell Road. See McIntyre, 595 N.E.2d at 336.

As we have noted, in order to forestall summary judgment, the record evidence must be "'sufficiently open-ended to permit a rational fact finder to resolve the [liability] issue in favor of either side.'" Ramírez-Carlo v. United States, 496 F.3d 41, 46 (1st Cir. 2007) (citation omitted). Here, given the significant evidence indicating that the Town of Bedford, and not the United

States, controlled Hartwell Road, we conclude that the district court appropriately granted summary judgment to the United States.

We turn to Brown's claim against Boston Edison. Unlike the United States, Boston Edison concedes owning part of the allegedly dangerous condition, viz., Pole 16.[5] We thus return to the governing principles of Massachusetts negligence law. In cases where the liability of a utility company for harm caused by one of its utility poles is at issue, the Supreme Judicial Court of Massachusetts has taken a more focused approach to the duty analysis. In such cases, the duty analysis is directed by § 368 of the Restatement (Second) of Torts. Afarian, 866 N.E.2d at 907 (concluding that the principles expressed in § 368 "provide a functional framework for determining the issue of duty"); id. at 908 ("We adopt the approach set forth in § 368 of the Restatement because it comports with concepts of reasonable foreseeability . . . .").[6]

---

[5] We noted earlier that the general rule is that "liability . . . commonly depends upon control of the offending instrumentality, either through ownership or otherwise." See Underhill, 151 N.E.2d at 290 (emphasis added). As we discuss infra, however, where the liability of a utility company for harm caused by one of its utility poles is at issue, Massachusetts law, following § 368 of the Restatement (Second) of Torts, focuses on "possession." Any potential dissonance between these standards is of no consequence here. Boston Edison concedes that it owns the pole and that it is responsible for the pole's maintenance. The company does not put its "control" of the pole into question, nor does it controvert "possession" for purposes of analysis under § 368.

[6] The parties appear to be under the impression that the Maryland Court of Appeals' decision in Coates v. S. Md. Elec. Coop., Inc.,

Section 368, titled "Conditions Dangerous to Travelers on Adjacent Highway," deals specifically with liability for harm caused by artificial conditions on land bordering highways.[7] Section 368 provides:

> A possessor of land who creates or permits to remain thereon an . . . artificial condition so near an existing highway that he realizes or should realize [the artificial condition] involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway, is subject to liability for physical harm thereby caused to persons who (a) are traveling on the highway, or (b) foreseeably deviate from it in the ordinary course of travel.

Before proceeding to the duty analysis, we pause to address some tangential issues. Here, all parties agree that the artificial condition that posed the risk of harm is not the pole alone but the location of the pole on the road-side of the guardrail. And although Boston Edison did not "create" this

---

731 A.2d 931 (Md. 1999) -- which identified a number of factors a court may consider when conducting the duty analysis in cases where a utility pole has been struck -- is controlling. The parties are mistaken. Although the Supreme Judicial Court referenced Coates in the Afarian decision, it made clear that Coates is merely illustrative of one approach courts have taken when examining cases that arise in this context. Afarian, 866 N.E.2d at 906. The Supreme Judicial Court explicitly adopted the approach articulated in § 368 of the Restatement rather than the Coates approach. Id. at 908.

[7] Although § 368 speaks to potential duties owed by the "owners or occupiers" of the bordering land, the Supreme Judicial Court established in Afarian that duties may be owed by utility companies that maintain poles on the bordering land. 866 N.E.2d at 908.

condition insofar as the guardrail was installed by an unknown third party, the argument runs that it permitted the condition to remain on the bordering land.

With that brush cleared we are presented with two central inquiries:  whether a reasonable jury could find (1) that Boston Edison realized or should have realized that the pole's location posed an unreasonable risk of harm to the traveling public and (2) that Brown foreseeably deviated from the highway.  The parties train much of their fire on the latter question, realizing that in order for Brown to be included in the class of plaintiffs covered by § 368, he must have foreseeably deviated from the highway.  See Afarian, 866 N.E.2d at 908 (not reaching the question of whether utility company realized or should have realized pole placement created an unreasonable risk of harm because drunk driver did not foreseeably deviate from highway); see also Miller v. Highway Comm'r, 801 N.E.2d 599, 606 (Ill. App. Ct. 2004) ("For a duty to arise under section 368, the person to whom the duty is owed must foreseeably deviate from the roadway in the ordinary course of travel . . . .").  But both inquiries must be answered, and we focus our attention on the equally dispositive former question -- whether Boston Edison realized or should have realized that the location of the pole on the road-side of the guardrail posed an unreasonable risk of harm to the traveling public.  This is, at

bottom, also a question of foreseeability, albeit not the same question as is posed by the second inquiry.

Nothing in the record suggests that Boston Edison actually realized that the pole posed an unreasonable risk because of its location in relation to the guardrail. Prior to Brown's accident, the guardrail had never channeled anyone into the pole, and in fact, the pole had never been struck. And Brown failed to produce evidence that the dangerous condition had been brought to Boston Edison's attention.

Thus, the question becomes whether Boston Edison should have realized that the pole's location posed an unreasonable risk to the traveling public. After examining the record, we must answer this question in the negative.

No reasonable jury could conclude that Boston Edison should have realized, when it originally placed or replaced Pole 16, that the pole's location in relation to the guardrail posed an unreasonable risk to the traveling public. The reason is obvious. The guardrail did not exist until approximately 1990, and Boston Edison had most recently replaced the pole in 1964, twenty-six years prior.

Brown wisely eschews any argument to the contrary and instead suggests that Boston Edison should have realized that the guardrail/pole combination posed an unreasonable risk because, in the eight years preceding Brown's accident in 2002, twenty-eight

motor vehicle accidents occurred in the vicinity of the pole.  To support this point, he submitted police logs to the district court which catalogued these accidents.  We are not persuaded, however, that these police logs create a triable issue for the jury.

Even if we were to assume that Massachusetts law would impose a duty on utility companies to survey the location of its poles if made aware that accidents occurred in the vicinity of the poles, and we doubt it would, nothing in the record indicates that Boston Edison was presented with information or otherwise made aware that accidents were occurring in the vicinity of Pole 16. Therefore, for Brown's argument to succeed, we must assume that Massachusetts law would impose an additional duty on utility companies -- the duty to independently seek out information about accidents occurring near its poles.  We read nothing in Massachusetts law that counsels the imposition of such a duty. See Afarian, 866 N.E.2d at 908 ("In view of our society's dependence on the services supplied by utility companies, and the public benefit of receiving those services, public policy favors some limitation on the liability of utility companies.") (citations omitted).[8]

_____

[8] We note that Brown does not argue that Boston Edison was under a continuing duty to inspect the location of all of its utility poles in order to determine whether changing road conditions had made the poles a risk to travelers.

Declining to advance such an argument was wise.  We are aware of no judicial decision imposing such a vast precautionary duty on utility companies and the few courts that have directly considered whether such a duty exists have concluded that it does not. See Coates, 731 A.2d at 945 (concluding that a utility company is

-14-

Having concluded as we do, there is no need to reach the district court's alternative holding -- that Brown's claim against Boston Edison is barred by Massachusetts' statute of repose, MASS. GEN. LAWS ch. 260, § 2B.[9]

### III. Conclusion

For the reasons provided above, the judgment is affirmed.

**AFFIRMED**.

---

"under no tort duty to make any massive engineering inspection of all of [its] poles . . . existing along the streets and roads of the State"); Miller, 801 N.E.2d at 609-10 (declining to impose on the utility company a duty that would require the company to "continuously monitor changes in road and other relevant conditions to determine whether a particular utility pole had been placed in a dangerous location").

[9] As a postscript, we note that Brown argues that the district court erred when it refused to consider the Massachusetts Highway Design Manual, which Brown attached to his opposition to summary judgment motion. Brown attached the manual for the purpose of establishing that guardrails are used to prevent a vehicle from leaving the roadway and striking a fixed object more objectionable than the guardrail itself. The district court declined to consider the manual, concluding that Brown made no showing that the manual was applicable to the guardrail installed on Hartwell Road or that it was in effect when the guardrail was installed. Whether or not the district court erred when it refused to consider the manual, however, is of no consequence in light of our duty analysis above.