Kelly **BRUSH,** Plaintiff

v.

**JIMINY PEAK MOUNTAIN RESORT, INC., et al, Defendants**

and

**St. Lawrence University, Defendant/Third–Party Plaintiff**

v.

**Middlebury College, et al, Third–Party Defendants.**

**C.A. No. 07–10244–MAP.**

United States District Court, D. Massachusetts.

June 11, 2009.

Michael H. Burke, George W. Marion, Bulkley, Richardson & Gelinas, Springfield, MA, for Jeffrey Pier.

John B. Connarton, Jr., Luke R. Conrad, Donovan Hatem, LLP, Boston, MA, for Barry Bryant.

William J. Dailey, Jr., Lawrence J. Kenney, Jr., Brian H. Sullivan, Sloane & Walsh, LLP, Boston, MA, Robert M. Mack, Morrison, Mahoney & Miller, Springfield, MA, for Williams College.

Thomas E. Day, Edward J. McDonough, Jr., Egan, Flanagan & Cohen PC, Springfield, MA, for St. Lawrence University.

Walter E. Judge, Jr., Robert B. Luce, Downs, Rachlin & Martin, PLLC, Burlington, VT, for Kelly Brush.

David B. Mongue, Donovan & O'Connor, LLP, North Adams, MA, for Jiminy Peak Mountain Resort, Inc.

Robert B. Smith, Nelson, Kinder, Mosseau & Saturley, P.C., Boston, MA, for Middlebury College.

Gerald F. Lucey, Nelson, Kinder, Mosseau & Saturley, P.C., Boston, MA, for Forest Carey.

## MEMORANDUM AND ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT

PONSOR, District Judge.

### I. INTRODUCTION

This case stems from a tragic skiing accident that left the plaintiff, Kelly Brush, permanently disabled. The accident occurred during a collegiate ski race on February 18, 2006 when Brush lost control and crashed into a ski lift stanchion just off the trail. In her six-count amended complaint Brush alleges that the severity of her injuries was the result of negligence or gross negligence on the part of the following defendants: Jiminy Peak, Inc., the operator of the ski area where the accident occurred; Williams College and two of its ski coaches, Edward Grees and Oyestein Bakken, who organized the competition; St. Lawrence University and its ski coach, Jeffrey Pier, who was the referee of the race during which Brush was injured; and Barry Bryant, who served as the competition's Technical Delegate from the Federation Internationale de Ski ("FIS"). Pier and St. Lawrence University have also filed a third-party complaint seeking contribution from Brush's school, Middlebury College, and its ski coach Forest Carey, who was a race referee for a race on the same trail the day before Brush's accident. Before the court are motions for summary judgment from all of the parties.

Jiminy Peak argues that pursuant to the Massachusetts Ski Safety Act ("MSSA") it, as the ski area operator, has no liability because Plaintiff's injuries were caused by her collision with an object off the trail. The other Defendants assert that Plaintiff cannot recover from them because she executed a liability waiver that covered Defendants and their alleged negligence when she registered with the United States Ski and Snowboard Association ("USSA"). The Third–Party Defendants argue that as a matter of law they have no obligation to contribute even if Third–Party Plaintiffs Pier and St. Lawrence are liable to Plaintiff. Plaintiff asks the court to rule that the MSSA does not bar her claims against Jiminy Peak and the USSA liability waiver is not applicable to bar the claims of the other Defendants. Finally she asserts that the facts are sufficient to permit this case to go to trial on a theory of gross negligence, even if the USSA waiver is valid.

For the reasons set forth below, the court will allow all Defendants' motions for

summary judgment, deny Plaintiff's motion, and order entry of judgment for Defendants.

## II. *BACKGROUND*

The facts are largely undisputed. Where disputes exist, the court has viewed the facts in the light most favorable to Plaintiff.

### A. *The Accident.*

Brush was injured while competing in the Williams Winter Carnival, a two-day event at the Jiminy Peak ski area in Hancock, Massachusetts hosted by the Williams College Outing Club in association with the Williams College ski team. The Winter Carnival is part of the regular season of the Eastern Intercollegiate Ski Association (EISA), one conference within the ski program of the National Collegiate Athletic Association (NCAA). The competition was also held under the auspices of the USSA and the FIS, which in the United States operates through the USSA. As a result of the USSA/FIS affiliation, all competitors in the Winter Carnival had to be USSA members, though not all had to be NCAA athletes. The USSA/FIS designation meant that skiers could earn "points" to improve their international, individual standing by competing in the Winter Carnival events.

The particular event during which Plaintiff was injured was the Giant Slalom, which took place on the second day of the Winter Carnival. This event requires skiers to pass through "gates" set along the trail as they descend the slope as quickly as possible. Skiers are ranked based on their best time through the course and are not penalized for any runs they fail to finish, due for example to a fall. Technological changes in the past decade have increased the sport's risks. New ski designs allow skiers to reach speeds of forty miles per hour. At the same time it has become harder to predict how skiers will fall if they lose control. Some courses now are set with gates at the edges of the trail to maximize the distance skiers must travel from one side of the trail to another in order to slow skiers down. Persons involved with competitive skiing are aware that technical changes have increased the importance of proper placement of safety equipment during competitions.

Under NCAA and USSA rules, members of the "competition jury" have a responsibility to inspect the layout of a trail prior to its use during a competition. The competition jury for the race during which Brush was injured included the "Chief of the Race," Defendant Edward Grees, the head ski coach at Williams; the "Chief of the Course," Defendant Oyestein Bakken, an assistant ski coach at Williams; the "Race Referee," Jeffrey Pier, a ski coach at St. Lawrence University; and the "Technical Delegate," Defendant Barry Bryant. Third-party Defendant Forest Carey, the Middlebury coach, was the "Race Referee" for a race that used the same trail the previous day.

The USSA requires that trails used in competitions be "homologated," which means that the trail has been confirmed to meet the relevant FIS regulations. The USSA also mandates that trails be prepared in keeping with homologation requirements. The parties disagree about whether all members of the jury were responsible for confirming that the trail was set consistent with the homologation report, but for purposes of this memorandum the court will assume they were. Additionally, there is a dispute as to whether the trail was, in fact, prepared as set out in a homologation report drafted in keeping with FIS requirements. Again, for purposes of its rulings here, the court will

assume that the trail was not prepared as the homologation report contemplated.

Plaintiff asserts that the relevant homologation report required that "B-netting," a type of netting used to slow errant skiers before they collide with objects, be placed along the edge of the trail starting uphill from any lift tower and continuing downhill some distance past the lift tower. The homologation report, completed in 2002 by Defendant Grees and an FIS representative for the area where Plaintiff was hurt, included a diagram showing such B-netting. While at least some of the defendants assert the report merely displays safety equipment that *might* be necessary, rather than the minimal *required* safety equipment, the court will, again, assume for the current purposes that the report indicated that B-netting should have been installed above and below lift towers. The parties do agree that B-netting was not set up according to the diagram on the day Plaintiff was hurt.

At the time of Plaintiff's accident there was B-netting along the left edge of the trail, stopping at a point approximately even with the gate where Brush lost control and somewhat uphill from a lift tower. No other netting was placed between the trail and the tower, so that the area directly in front of the tower lacked any protection. In prior years B-netting was placed in accordance with a diagram in the homologation report, extending past the lift tower above and below.

Not only was there less B-netting on February 18, 2006 than there was in the past, there were no triangular nets set around the lift tower itself. Triangular nets are another available type of safety netting used to deflect a skier from a particular hazard. Additionally, neither the tower nor its support stanchion was equipped with a type of padding known as Willy Bags, though such padding is regularly used in speed events.

After the Giant Slalom course was set, Plaintiff had an opportunity to ski down the slope to assess the course, and she did so. Later, during one of her timed runs, Plaintiff caught an edge of one of her skis and lost control. As a result she left the trail and struck the unprotected lift tower support stanchion. The collision caused life-altering injuries to Plaintiff, including paraplegia.

### B. *Relevant Agreements.*

#### 1. *USSA Waiver.*

At the time of her accident Plaintiff was a member of the USSA and the FIS. During the summer of 2005 registration forms for both organizations were completed on her behalf.[1] The FIS waiver included language acknowledging the risks of skiing competitively. Additionally, it stated that national or club organizations in the United States may require a skier to waive any liability claims in order to participate in their activities.

Those completing the USSA registration form had to sign a clearly-labeled liability release. (Dkt. No. 142, Ex. 9.) Pursuant to that release a USSA member

> unconditionally WAIVES AND RELEASES ANY AND ALL CLAIMS, AND AGREES TO HOLD HARMLESS, DEFEND AND INDEMNIFY USSA FROM ANY CLAIMS, present or future, to Member or his/her proper-

---

1. The parties agree that Plaintiff's mother signed the relevant USSA Release and FIS Registration with Plaintiff's full consent and authorization. They further agree that the weight given to those documents should be the same as it would be if Plaintiff had signed them herself. (Dkt. No. 162, Pl.'s Resp. to Defs.' Joint Statement of Undisputed Material Facts at 18.)

ty, or to any other person or property, for any loss, damage, expense, or injury (including DEATH), suffered by any person from or in connection with Member's participation in any Activities in which USSA is involved in any way, due to any cause whatsoever *INCLUDING NEGLIGENCE* and/or breach of express or implied warranty on the part of USSA.

*Id.*

As used in the release "USSA" referred to the United States Ski and Snowboard Association and "its subsidiaries, affiliates, officers, directors, volunteers, employees, coaches, contractors and representatives, local ski clubs, competition organizers and sponsors, and ski and snowboard facility operators." Id. The term "Activities" included "skiing and snowboarding in their various forms, as well as preparation for participation in, coaching, volunteering, officiating and related activities in alpine, nordic, freestyle, disabled, and snowboarding competitions and clinics." *Id.*

### 2. *Agreements Between Defendants.*

The Williams College ski team utilized the Jiminy Peak ski area for its Winter Carnival and for practice sessions pursuant to a written agreement between the parties. (Dkt. No. 158, Tab 18, Jiminy Peak/Williams College Contract.) That five-paragraph agreement gave Williams and members of its community various types of access to the ski area in exchange for a single annual payment. Jiminy Peak agreed to have its mountain manager work with the Williams alpine coach to determine safe conditions for ski team training and to make and groom snow for the trails that were used during the annual winter carnival.

Jiminy Peak and Williams College were also parties to an Alpine Schedule Agreement with the USSA. Pursuant to that agreement the competition was listed on the USSA's official schedule; all competitors had to be members of the USSA; competitors, as noted, were able to earn "points;" competition organizers had to agree to allow some non-collegiate USSA members to compete; and members of the competition jury had to be members of USSA. Additionally, the agreement required that facilities "to be used in the actual competition events . . . conform with applicable rules and with requirements of the [Technical Delegate] and competition jury." (Dkt. No. 158, Tab 8, Alpine Schedule Agreement 2, ¶ 8.) The competition organizer, the Williams College Outing Club, was responsible for "working with" Jiminy Peak, the USSA, and the competition jury to select facilities and ensure that they were prepared in accordance with "such rules or requirements, and homologation or facility approval requirements according to discipline and type of competition." *Id.*

### III. *DISCUSSION*

"Summary judgment is appropriate where 'there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law.'" *Coffin v. Bowater, Inc.,* 501 F.3d 80, 85 (1st Cir.2007) (citing Fed.R.Civ.P. 56(c)). "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris,* 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc.*

*v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir.2001).

### A. *Claims Against Jiminy Peak.*

■ Plaintiff asserts three claims against Jiminy Peak: negligent operation of a ski area in violation of the MSSA (Count I); negligent failure to undertake duties assumed under a contract with Williams (Count II); and negligent inspection (Count III). "To prevail in a negligence action under Massachusetts law, a plaintiff must prove that (1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached this duty; (3) damage to the plaintiff resulted; and (4) the breach of the duty caused this damage." *Brown v. United States*, 557 F.3d 1, 3 (1st Cir.2009) (quoting *Jupin v. Kask*, 447 Mass. 141, 849 N.E.2d 829, 835 (2006)). Jiminy Peak asserts that under the MSSA it did not owe Plaintiff any duty to use reasonable care to prevent her collision with an object *off* the ski trail. Plaintiff argues that Jiminy Peak had a duty to her pursuant to the MSSA and its agreements with Williams College and the USSA.

### 1. *Statutory Duty.*

■ The MSSA serves two somewhat contradictory purposes, (1) to limit the liability of ski operators in order to ensure their economic survival and (2) to ensure skier safety. *McHerron v. Jiminy Peak, Inc.*, 422 Mass. 678, 665 N.E.2d 26, 27 (1996). Pursuant to the MSSA a ski area operator has a general duty to operate the "ski areas under its control in a reasonably safe manner." Mass. Gen. Laws ch. 143, § 71N(6) (2008).

However, this duty is sharply limited by other provisions of the act. Of particular relevance in this case is that the MSSA places "the duty to avoid any collision with any . . . object on the hill below" solely on the skier, so long as the object was not improperly marked. *Id.* at § 71O. The MSSA does shift the duty to avoid collisions back to the ski area operator when the ski operator has not marked the obstruction "pursuant to the regulations promulgated by the [recreational tramway] board" or "as otherwise provided" in the statute. *Id.; see also Eipp v. Jiminy Peak, Inc.*, 154 F.Supp.2d 110, 116 (D.Mass.2001) (declining to enter summary judgment for the ski area operator where skier was injured after striking "a snowgun in the middle of a ski trail"). At the time of Plaintiff's accident the only active regulations, at 526 C.M.R. Chapter 10.00, did not address signage requirements.

The other requirements established by the MSSA require ski area operators to (1) mark maintenance and snow-making equipment that is in use, *Id.* at § 71N(1), (2) mark with flashing lights trail maintenance and emergency vehicles in use in a ski area, *Id.* at § 71N(2), and (3) mark the location of snow-making hydrants "within or upon a slope or trail." *Id.* at § 71N(4).

■ Under the MSSA, skiers are also solely responsible for any injuries resulting from skiing anywhere other than on an open slope or trail.[2] *Id.* at § 71O; *Spinale v. Pam F., Inc.*, 1995 Mass.App. Div. 140, 142 (Mass.App.Div.1995) ("[Section] 71O expressly imposes responsibility for injuries sustained while 'skiing on other than an open slope or trail within the ski area' on the skier, and thereby exempts the ski area operator from liability for the

**2.** A "[s]ki slope or trail" is limited to the "area designed by the person or organization having operational responsibility for the ski area as herein defined, including a cross-

country ski area, for use by the public in furtherance of the sport of skiing. . . ." Mass. Gen. Laws ch. 143, § 71I.

same."). The ski area operator has no duty to provide netting or padding around obstacles off the trail. *Walsh v. Jiminy Peak, Inc.,* No. 02–11890–MAP, 2005 U.S. Dist. LEXIS 18463 at *12–13 (D.Mass. Aug. 29, 2005). Nor does it assume such a duty by padding some obstacles. *Id.* Indeed, this court has previously noted that "imposing liability on ski area operators for duties voluntarily assumed but negligently performed would undercut a key goal of the MSSA," because it would discourage ski area operators from adding safety features. *Id.* at *16.

■■ The parties agree that the lift tower stanchion[3] Plaintiff struck was "off the course and off the trail." (Dkt. No. 162 at 23.) Given these facts, the MSSA placed the duty to avoid collisions on Plaintiff alone.[4]

■ Plaintiff argues that Jiminy Peak's duty to her was not fully circumscribed by the MSSA because her injury occurred during the course of a race. Ski racing is certainly dangerous, perhaps more dangerous than ordinary recreational skiing because speed is pursued sometimes to the limit of a skier's competence, and beyond. Jiminy Peak undoubtedly was aware of the dangers associated with ski racing and took some steps, together with the race organizers, to try to reduce those dangers. However, no authority suggests that Jiminy Peak or any other ski operator in Massachusetts owes a greater duty to racing skiers than to other, perhaps less experienced, recreational skiers.

Plaintiff asserts that Jiminy Peak assumed a greater duty to racing skiers, similar to the heightened duty one Massachusetts trial court determined ski area operators owed to a minor child enrolled in an instructional program. *Sanchez–Souquet v. Jiminy Peak, Inc.,* 1997 WL 693018, 1997 MBAR–094 1997 Mass.Super. LEXIS 198 (Mass.Super.Ct.1997). In *Sanchez–Souquet,* the state court concluded that it was unfair to require "a ski student to 'assume the risk' for his injury"

---

3. Plaintiff separately argues that Jiminy Peak had a specific duty to protect skiers from collisions with ski lift stanchions pursuant to 526 C.M.R. 10.09(4)(b). That regulation specifies that ski area operators are to fence or barricade any area of the tramway that could cause injury to a person. However, that requirement appears within a section entitled "Protection Against moving parts or Other Hazards and Clearance Envelopes." *Id.* at 10.09(4). Given that context, it is clear that this fencing requirement is only intended to keep members of the public from getting too close to moving parts of a tramway system which might cause injury and does not apply to nonmoving elements like stanchions and support towers.

4. Ski area operators' liability is also limited such that they "shall not be liable for damages to persons or property, while skiing, which arise out of the risks inherent in the sport of skiing." Mass. Gen. Laws ch. 143, § 71N(6). The parties disagree about the applicability of this limitation to this case. Jiminy Peak argues that collisions with off-trail objects, regardless of their cause, are a risk inherent in the sport of skiing. Plaintiff notes that the "inherent risks" enumerated in the statute are natural conditions that can cause a skier to lose control, not dangers that result from such a loss of control. *Id.* at § 71O (enumerating the "risks inherent in the sport of skiing" as including "variations in terrain, surface or subsurface snow, ice conditions or bare spots"). Plaintiff appears to have the stronger argument that off-trail collisions, though not unexpected, are in a different category than the inherent risks identified in § 71O. As neither party suggests that Plaintiff's crash resulted from an encounter with a natural condition like those listed in the statute, the limitation on ski area operator liability related to inherent risks of skiing is irrelevant. The determinative fact in this case, undisputed on the record, is that Plaintiff lost control and struck a stationary object, the stanchion, *off* the trail. The MSSA shields Jiminy Peak from liability in this situation. There is no need for an "inherent risk" analysis.

because ski area operators knew that such skiers lacked experience and judgment and were relying on their instructors to keep them safe. *Id.* at *4, 1997 Mass.Super. LEXIS 198 at *9. Plaintiff urges this court to conclude that racing skiers also should be held to a lower standard than regular recreational skiers because, like students learning to ski, competitive skiers ski at the edge of their ability. Even if the court was persuaded that the court reached the correct outcome in *Sanchez–Souquet* (a decision the court need not, and does not, reach) it would not be inclined to carve out a further exception for competitive skiers. While it may be unreasonable to presume that a child learning to ski "know[s] the range of his own ability to ski on any slope, trail or area," a similar presumption cannot be applied to collegiate competitive skiers. Mass. Gen Laws ch. 43, § 710.

■ More importantly, the MSSA applies to all skiers, a group which includes "any person utilizing the ski area under control of a ski area operator for the purpose of skiing...." *Id.* at § 71I; *Fetzner v. Jiminy Peak, The Mountain Resort,* 1995 Mass.App. Div. 55, 56 (Mass.App.Div. 1995) ("The definition of skier in G.L.c. 143 includes any person utilizing the ski area."). Competitive skiers thus have the same responsibility to avoid collisions with objects off the trail as other skiers. Ski area operators simply have no duty under the statute to prevent the injuries suffered by a skier who collides with an off-course obstacle. Without such a duty, Jiminy Peak's alleged negligence cannot give rise to liability. *McHerron v. Jiminy Peak, Inc.,* 422 Mass. 678, 665 N.E.2d 26, 28 (1996) ("As the defendant had no duty to remedy a statutorily defined unavoidable risk inherent in the sport of skiing, the defendant's alleged negligence in failing to eliminate the [risk] does not create liability.").

2. *Contractual Duty.*

■ Plaintiff asserts that even if Jiminy Peak did not have a duty to her pursuant to the MSSA or through its voluntary safety efforts, it did have a contractual duty to undertake specific steps to ensure the competition would be as safe as possible. Failing to take those steps, Plaintiff asserts, constituted a breach of a separate, non-statutory duty. Massachusetts recognizes that "a claim in tort may arise from a contractual relationship ... and may be available to persons who are not parties to the contract." *Parent v. Stone & Webster Engineering Corp.,* 408 Mass. 108, 556 N.E.2d 1009, 1012 (1990). However, Jiminy Peak did not obligate itself to provide particular safety measures, such as netting or padding, in either of the two contracts relied on by Plaintiff. Pursuant to its agreement with Williams College, Jiminy Peak agreed to consult about safe training conditions for Williams skiers and to permit use of several trails for the Winter Carnival competition. Under the Alpine Schedule Agreement, the competition organizers are responsible for "working with" the ski area operator to ensure that ski facilities were prepared in accordance with all USSA rules, regulations, and applicable homologation requirements. The ski area operator, Jiminy Peak, did not itself undertake that responsibility and therefore any failure to ensure that applicable safety requirements were met did not give rise to tort liability.

B. *Claims Against Competition Organizers and Officials.*

1. *The USSA Waiver.*

■ Defendants collectively argue that Plaintiff's various negligence claims are precluded by the liability waiver executed when her USSA membership was renewed the summer before her accident. Plaintiff

asserts that the waiver does not bar her claims because its language was ambiguous as to the persons and entities it covered. In resolving this question the court applies Colorado law, as urged by Plaintiff and agreed to by Defendants. The waiver includes a choice of law provision selecting Colorado law and in the absence of a "substantial Massachusetts public policy reason," Massachusetts law honors choice of law provisions in contracts. *Jacobson v. Mailboxes Etc. U.S.A.*, 419 Mass. 572, 646 N.E.2d 741, 744 (1995).

Under Colorado law "[e]xculpatory agreements are disfavored and, therefore, they are strictly construed against the party seeking to limit its liability." *Del Bosco v. United States Ski Ass'n*, 839 F.Supp. 1470, 1473 (D.Colo.1993). Under Colorado law the applicability of a liability waiver is a legal question to be resolved by the court after consideration of four factors: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones v. Dressel*, 623 P.2d 370, 376 (Colo.1981) (citations omitted). Plaintiffs urge the court to rule that the waiver invoked by Defendants is inapplicable under the third and fourth factors.

As to the third factor, Plaintiff argues that the USSA waiver was a contract of adhesion because the USSA's dominance over amateur ski racing in this country prevented her from being able to negotiate less onerous contract terms with the USSA. "Colorado defines an adhesion contract as 'generally not bargained for, but imposed on the public for a necessary service on a take it or leave it basis.' " *Bauer v. Aspen Highlands Skiing Corp.*, 788 F.Supp. 472, 474 (D.Colo.1992) (citing

*Jones v. Dressel*, 623 P.2d 370, 374 (Colo. 1981)).

On the undisputed facts of this case, Plaintiff's "adhesion" argument must fail, because under Colorado law recreational activities and services are not essential. *Rowan v. Vail Holdings, Inc.*, 31 F.Supp.2d 889, 898 (D.Colo.1998) (holding that waiver was not fairly entered because skier was skiing "as a part of work, not as a part of recreation"); *Bauer*, 788 F.Supp. at 475 (enforcing waiver executed as part of ski rental, even though all ski rental outlets used similar waivers, because such services were recreational, not essential). Plaintiff completed the USSA waiver in order to engage in a recreational activity. The nature of the activity is not changed by its competitive nature, its subjective importance in Plaintiff's life, or the fact that a single entity controlled virtually all opportunities to engage in the recreational activity. *But see O'Connor v. United States Fencing Ass'n*, 260 F.Supp.2d 545, 552 (E.D.N.Y.2003) (concluding that a liability waiver was not binding under Colorado law because the waiver's author so controlled the sport of fencing that an athlete wishing to compete had no choice but to agree to the terms in the waiver).

Finally, Plaintiff argues that the waiver did not express the parties' intentions in clear and unambiguous language. Having reviewed the waiver, the court concludes that the language of the waiver was clear and unambiguous. Clear language indicates that the signer is waiving all claims against the USSA including those based on negligence, as indicated in bold, italic, capital letters. *See Jones*, 623 P.2d at 378. The waiver defined USSA quite expansively to encompass a host of individuals and groups including all affiliates, volunteers, competition organizers, sponsors, coaches, and representatives. It is clear that the list was meant to encompass any-

one involved in running a competition sanctioned by the USSA. Finally, it is undisputed that skiers, including Plaintiff, participating in the Williams Winter Carnival knew the event was sanctioned by the FIS through the USSA because they knew they were competing, in part, for FIS points.

### 2. *Gross Negligence.*

Plaintiff asserts that even if the USSA waiver is valid, she should be able to proceed against these Defendants on a theory of gross negligence. The argument is colorable but ultimately unpersuasive.

 It is true that under Colorado law an exculpatory agreement cannot "provide a shield against a claim for willful and wanton negligence." *Id.* at 376. In Colorado an individual who "purposefully committed an affirmative act which he knew was dangerous to another's person and which he performed heedlessly, without regard to the consequences or rights and safety of another's person" can be found to have acted with willful and wanton negligence. *Barker v. Colorado Region–Sports Car Club of America, Inc.,* 35 Colo.App. 73, 532 P.2d 372, 379 (Colo.Ct.App.1974). In Massachusetts, waivers may only release a defendant from ordinary negligence. *Zavras v. Capeway Rovers Motorcycle Club, Inc.,* 44 Mass.App.Ct. 17, 687 N.E.2d 1263, 1265 (1997).

 Plaintiff has alleged in her complaint that Defendants were grossly negligent. Gross negligence involves "materially more want of care than constitutes simple inadvertence," though "it is something less than [ ] willful, wanton and reckless conduct." *Altman v. Aronson,* 231 Mass. 588, 121 N.E. 505, 506 (1919). Despite the severity of Plaintiff's injuries, the conduct alleged by Plaintiff is simple inadvertence. There is no evidence in the record, and indeed no allegation, that any of the Defendants, or anyone at the competition, became aware that there was an area of the trail without netting where netting was normally placed and declined to remedy the situation. At most there was a collective failure to take a step that might have lessened the injuries suffered by Plaintiff. No reasonable jury could find that this simple inadvertence, no matter how tragic its consequences, constituted gross negligence.

### C. *Third–Party Claims.*

 Having concluded that all Defendants, including the Third–Party Plaintiffs, are entitled to summary judgment, the court necessarily grants Third–Party Defendants' motion for summary judgment on the third-party contribution claims asserted against them. Any negligence on the part of Forest Carey, whether in his capacity as a race official or as Plaintiff's coach is expressly covered by the USSA waiver. Even if the court had concluded that the waiver was inapplicable, Third–Party Defendants would be entitled to summary judgment because Carey simply did not breach any duty he owed to Plaintiff. His role as a race official concluded the day before Plaintiff's accident. As a competitor on the following day, Plaintiff was outside the group of people likely to be injured by his acts or omissions as a referee. Therefore he had no duty with respect to her safety. *See Matteo v. Livingstone,* 40 Mass.App.Ct. 658, 666 N.E.2d 1309, 1312 (1996) (citing *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928)). The risk which caused Plaintiff harm, improper safety fencing, was similarly not reasonably foreseeable to Carey in his capacity as her coach. *See Moose v. Mass. Inst. of Tech.,* 43 Mass.App.Ct. 420, 683 N.E.2d 706, 710 (1997) (upholding a jury's finding that a coach was negligent where the risk which caused a student-

**152**

athlete's injury was reasonably foreseeable). Third-party Defendants would thus be entitled to summary judgment even absent the USSA waiver.

### IV. *CONCLUSION*

This is a terribly sad case. A young woman has been tragically, permanently injured. Putting aside considerations of legal liability, somebody connected with the 2006 Winter Carnival should, as a matter of conscience and professionalism, have noticed the unprotected ski tower and made sure that appropriate netting was installed to provide a greater degree of protection to the competitors.

It would, however, be false compassion now to ignore the undisputed facts and the unavoidable law. The Massachusetts Ski Safety Act, in the case of Jiminy Peak, and the USSA waiver, in the case of the other Defendants, forecloses any possibility of liability for payment of damages to Plaintiff in these circumstances. To encourage pursuit of a lawsuit lacking a legal basis would only serve to compound the tragedy.

For the reasons set forth above, Defendants' Motions for Summary Judgment (Dkt. Nos. 135, 137, 138, 139, 140) are hereby ALLOWED, Third–Party Defendants' Motion for Summary Judgment (Dkt. No. 143) is hereby ALLOWED, and Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 157) is hereby DENIED. The trial scheduled for September 28, 2009 will obviously not go forward.

The Clerk is ordered to enter judgment for Defendants; the case may now be closed.

It is So Ordered.